GRIFFIS, P.J.,
for the Court:
¶ 1. Richard H. Pritchard appeals the chancellor’s judgment that denied his petition to modify alimony and found him in contempt for his failure to timely pay alimony to his ex-wife, Claudia J. Pritchard (“CJ”).
¶ 2. Richard argues that the chancellor ignored the presumption of mutual support that arose when CJ cohabited with Bruce Avery and, thus, held him to a higher standard of proof than was permissible and misapplied the law to the facts. Richard argues that CJ failed to rebut the presumption. We agree. Accordingly, we reverse and render judgment in favor of Richard.
FACTS
¶ 3. Richard and CJ were divorced on April 9, 1998. Under their property-settlement agreement, CJ received permanent periodic alimony at $3,000 per month from Richard. The payment increased to $3,150 per month on November 1, 1999, then to $3,350 on November 1, 2001. Finally, the payments are to be reduced to $2,000 per month after November 1, 2015. The alimony is payable until the death of either party or CJ’s remarriage.
¶ 4. On November 2, 2010, Richard filed a petition to modify alimony. He alleged that CJ and Bruce had a de facto marriage. Richard asked the court to terminate his obligation to pay alimony due to this material change in circumstances.
¶ 5. On April 26, 2011, CJ filed a petition for contempt. CJ asked the court to hold Richard in contempt because he had can-celled the life-insurance policy he was ordered to provide and because he had stopped alimony payments from December 2010 onward. The property-settlement agreement provided:
So long as Husband is liable to Wife for the payment of alimony, he shall keep his current life insurance in force. To that end, Husband agrees to maintain his current Protective Life Insurance policy and will not reduce the cash value of this policy by making a partial surrender of its coverage. Wife shall be the sole beneficiary of this policy and the policy carried at Nichols Research. Should Husband change employers, he shall secure a replacement policy of at least $50,000 in death benefits if it is available through his employer.
(Emphasis added). CJ argued that the first sentence meant that Richard must keep a life-insurance policy as long as he is liable to pay alimony. Richard argued that the last sentence meant that if he has no employer, and thus no policy available through his employer, then he does not have to provide coverage. On appeal, Richard only raises issues as to the presumption of mutual support and its rebuttal. Richard does not argue that it was error for the chancellor to order that he provide a life-insurance policy with CJ as the sole beneficiary.
¶ 6. CJ testified that she had lived with Bruce for four years. From 2007 to 2011, Bruce and CJ lived in at least three different locations together. First, they lived in Alabama. They moved from Alabama to Florida into a home that Bruce leased. According to CJ, she moved because she wanted to live close to the beach, and she had a Florida real-estate license. She worked for Coldwell Banker. However, CJ testified that she never sold any real estate because of the housing market.
¶ 7. In June 2008, Bruce’s divorce became final. Then, in April 2009, CJ and Bruce moved back to Birmingham because Bruce had expanded his business. At the time of trial, CJ was moving into a smaller apartment, and Bruce was moving else *1176 where because of a job opportunity. Bruce did not testify.
¶ 8. Bruce owned a landscape-construction business. Bruce gave CJ signature authority on his business’s checking account. CJ testified the authority was so that Bruce had a way to pay his portion of their living expenses. CJ was not a joint owner on the account.
¶ 9. CJ testified that during the four-year period, they had been sexually intimate. She stated that Bruce did not do any outside maintenance at their home. They did not take vacations together. Bruce did not go with her to visit family. They did not buy each other birthday and Christmas presents. He never bought her flowers or candy. But, he had bought her some cards. They each cleaned their respective portions of the house. He did his laundry; she did her laundry. She bought groceries, and he reimbursed her for a portion of the bill. They divided utilities. All of the expenses were in her name. She wrote the checks, and he reimbursed her for his half.
¶ 10. Bruce rented a car from CJ and paid his portion of the car insurance. She bought the car in March 2010. In 2010, Bruce worked for two Honda dealerships. Under their financial arrangement, she paid the bills initially, and he reimbursed her. CJ testified this was because his pay was erratic. She testified to an instance where he overpaid his expenses, and she immediately gave him back the money.
¶ 11. The alimony paid by Richard was CJ’s sole source of income in 2010. CJ also received $1,820 a month from Richard’s United States Air Force retirement income. CJ testified that she absolutely needed Richard’s money to “make it” financially. She testified that the alimony was her independence, that she did not “want to give that up for anybody or anything,” and that she “earned” it.
¶ 12. CJ testified, “[W]e don’t live like husband and wife.” Regarding her relationship with Bruce, CJ testified:
A. We don’t have common goals. We don’t have future plans. I don’t get involved in his family events or affairs or occasions. His daughter married in October; I didn’t go to the wedding. His son graduated from the police academy; I didn’t go to the graduation. Mr. Avery does not join in with my family affairs. We’re independent of each other.
Q. But you will admit that you cohabi-tated with him for the last four years?
A. Yes, it’s a financial arrangement.
¶ 13. CJ did not work in 2010, but she applied for several jobs. Her monthly living expenses, not including debts, were $1,995. Bruce’s monthly portion of the expenses was $1,759. On cross-examination, CJ was asked about the difference between the total of eleven months at $1,759 a month, $19,340, and the actual payments over eleven months that totaled $28,485 from Bruce. She answered that the $23,485 included reimbursement from the end of 2009. She testified, “I didn’t carry him[;] Bruce’s income has always been erratic. I was always reimbursed it just ... took him a little bit longer to reimburse me. But he reimbursed me fully and completely for all of his expenses.”
¶ 14. In November of 2010, CJ owed $140,653 to the IRS. Since then, she was unable to pay on the terms of her agreement with the IRS and defaulted. At the time of the divorce, she did not get Richard’s Air Force retirement, and she could not keep up with tax payments. Because of this, she withdrew funds from an IRA, and this caused additional penalties. CJ *1177 also had three credit cards. After November 2010, she took a loan from her sister. The company that held her car loans deferred the payments at her request. Additionally, CJ took out two more credit cards to pay her living expenses since Richard had stopped the alimony payments. She took one loan from her son and another loan from her daughter. She testified that $20,000 was the approximate debt she had accumulated since Richard stopped paying alimony.
¶ 15. CJ testified that she did not know her financial arrangement with Bruce put her alimony at risk. She testified that they had never discussed getting married. However, Richard testified:
She asked me about a year ago, what would happen if I got married. And I said, “Well, it’s pretty clear if you look in the divorce decree, you [lose] your alimony.” And she said, “What about the [A]ir [F]orce.” And I said, “No, you would still get that.” And I said, ‘Why are you planning on getting married?” And her response was, “No, I can’t afford to get married because I can’t afford to [lose] my alimony.” I mean, it was one other time when she was actually engaged to another man. Showed me the diamond. And that didn’t work out. But her response every time has been, “I don’t want to [lose] my alimony.”
¶ 16. Richard testified that he was not employed, and a life-insurance policy was no longer available to him. He also testified that he stopped the alimony payments when his attorney advised him that C J was not entitled to alimony.
¶ 17. The chancellor found there was insufficient evidence that CJ and Bruce ever mutually supported each other. According to the chancellor, CJ had presented sufficient evidence to rebut the presumption of mutual support that arose because of CJ’s cohabitation with Bruce.
The chancellor found that Richard was currently unemployed with no life insurance through an employer and that there was insufficient evidence to show proof of a current life-insurance policy with CJ as the sole beneficiary. The chancellor also ordered Richard to pay CJ $850 in attorney’s fees and to provide proof of a life-insurance policy with CJ as sole beneficiary. The chancellor found Richard in contempt and ordered him to pay $20,100 for his failure to pay alimony from December 2010 to May 2011.
STANDARD OF REVIEW
¶ 18. “This Court’s scope of review in domestic relations [matters] is strictly limited.” Brawdy v. Howell, .841 So.2d 1175, 1178 (¶ 8) -(Miss.Ct.App.2003). Furthermore, the chancellor’s findings will not be disturbed when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard. Bums v. Burns, 962 So.2d 618, 621 (¶ 15) (Miss.Ct. App.2006).
¶ 19. “Particularly in the areas of divorce, alimony[,] and child support, this Court is required to uphold the findings of fact made by a chancellor that are supported by substantial evidence and are neither arbitrary nor capricious.” Gris-som v. Grissom, 952 So.2d 1023,1027 (¶ 7) (Miss.Ct.App.2007) (citation omitted). The chancellor’s findings of fact about cohabitation, de facto marriage, and mutual support “are entitled to substantial deference when reviewed on appeal.” See Pope v. Pope, 803 So.2d 499, 504 (¶¶ 12-13) (Miss. Ct.App.2002).
ANALYSIS
¶20. The supreme court has found “that cohabitation creates a presumption of mutual support.” Scharwath v. Schar- *1178 wath, 702 So.2d 1210, 1210 (¶2) (Miss. 1997). The presumption shifts “the burden to the recipient spouse to come forward with evidence suggesting that there is no mutual support within his or her de facto marriage.” Id. at 1211 (¶ 7).
¶ 21. In Scharwath, the ex-wife, recipient spouse, had a sexual relationship with another man and provided him a truck and rent-free home. Id. at 1211 (¶¶ 5-6). The man, in turn, provided support around the house when he built a deck, retiled the basement, moved furniture, cut the grass, washed the car, and carried out the garbage. Id. at (¶ 6). “In kind” services must be assigned monetary value. See Tedford v. Dempsey, 437 So.2d 410, 422 n. 11 (Miss.1983). The supreme court in Scharwath held that the chancellor erred when he did not consider the mutual support. Scharwath, 702 So.2d at 1211 (¶ 6).
¶ 22. Periodic alimony may be terminated based on cohabitation or a de facto marriage. In her book, Professor Deborah H. Bell summarized this principle as follows:
Cohabitation and presumed support. In 1997, the supreme court discarded the fact-based test for determining whether an alimony payee’s cohabitation involves mutual financial support. The court reasoned that an alimony payor lacks the necessary information to prove mutual support between cohabitants. Accordingly, the court adopted a presumption that cohabitation is accompanied by financial support.... [Scharwath, 702 So.2d at 1211; see Alexis v. Tarver, 879 So.2d 1078,1082 (Miss.Ct.App.2004).]
A short period of cohabitation may not trigger the presumption. A chancellor properly refused to reduce alimony to a recipient whose friend and two sons moved into her house for five weeks after a hurricane. Her friend did not share her bedroom, bought groceries only once, and moved when his home
was repaired. [Tillman v. Tillman, 809 So.2d 767, 770 (Miss.Ct.App.2002).] In a factually unusual case, a chancellor properly conditioned an award of rehabilitative alimony on the wife’s moving from her boyfriend’s home and establishing her own residence. [Alexis, 879 So.2d at 1082.]
De facto marriage. Alimony may also be terminated even in the absence of cohabitation if a court finds that a payee is avoiding marriage to continue alimony. Alimony was terminated to a payee who was engaged without immediate plans to marry, even though there was little evidence of mutual financial support, on the basis that she had entered a de facto marriage. The court found significant that the couple appeared to fore-go marriage to obtain the benefits of alimony, stating that “equity should not require the paying spouse to endure supporting such misconduct.” [Martin v. Martin, 751 So.2d 1132, 1136 (Miss. Ct.App.1999).]
The de facto marriage test was restated recently to include an element of financial support. The court of appeals stated that alimony may be terminated where a recipient and another person “so fashioned their relationship, to include their physical living arrangements and their financial affairs, that they could reasonably be considered as having entered into a de facto marriage.” Applying this test, no de facto marriage existed based on proof that a woman spent several weekends with a man, that he stayed at her house overnight five or six times, and that he purchased groceries on those occasions. [Pope, 803 So.2d at 504.]
Deborah H. Bell, Bell on Mississippi Family Law § 9.10[2][a]-[b] (2005).
¶23. In Bums, the recipient spouse was paying for her “live in” ⅛ psychology *1179 cal evaluation, car tag, attorney’s fees, clothes, cell phone, materials for his job, and motel room charges. Bums, 962 So.2d at 622-23 (¶ 18). The “live in” provided “in kind” household services and chores, such as maintenance and repair of the home. We held that there was sufficient evidence to support the chancellor’s decision there to modify alimony, child support, and custody. Id. at 626 (¶ 38).
¶ 24. Here, the chancellor correctly found that the presumption of mutual support due to cohabitation applied because Bruce and CJ had lived together for four years, unlike the couple in Pope where there was no finding of cohabitation because they only spent a few weekends together overnight. See Pope, 803 So.2d at 504 (¶ 11). Because the presumption applied, CJ had the burden of coming forward with evidence to show there was no mutual support. See Scharwath, 702 So.2d at 1211 (¶ 7). The chancellor found that CJ had overcome the burden of showing a lack of mutual support.
¶ 25. Since the chancellor applied the proper legal standard, we look to the evidence to determine if he was manifestly or clearly erroneous. Bruce and CJ moved together at least three times, even across state lines. Importantly, the presumption of mutual support started in June 2007. Yet, the only evidence CJ offered was for 2010. Bruce paid nothing to CJ from January 9, 2010, to May 5, 2010. During that time, CJ was unemployed and Bruce was unemployed. Yet, CJ still paid all of their bills from Richard’s alimony that she received. Bruce did not “catch up” on reimbursement to CJ until November 2010.
¶ 26. CJ provided Bruce the benefit of not paying bills on time. Bruce did not have to pay interest or late payments. Bruce did not have to worry about his utilities being cut off. Bruce did not have to stress about his landlord evicting him or the dealership repossessing his car. CJ took care of everything, so none of that would happen.
¶ 27. CJ attempted to structure her relationship with Bruce so she could receive the benefits of the relationship with some semblance of respectability and at the same time continue her alimony payments from Richard. CJ’s relationship with Bruce was such that equity did not require Richard to continue to support CJ and Bruce.
¶ 28. After a thorough examination of the record, we find there is not sufficient evidence to support the chancellor’s conclusion that Bruce and CJ did not have a de facto marriage because of the way they arranged their financial affairs. Accordingly, we reverse and render in favor of Richard because CJ failed to rebut the cohabitation presumption.
¶ 29. Because Bruce and CJ’s arrangement was a de facto remarriage, in accordance with the property-settlement agreement’s terms, Richard no longer owed alimony and should not have been found in contempt. Because he no longer owed alimony, he also had no obligation to provide a life-insurance policy under the property-settlement agreement’s terms. Accordingly, the judgment of the chancellor is reversed and rendered.
¶ 30. THE JUDGMENT OF THE CHANCERY COURT OF WARREN COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, RUSSELL AND FAIR, JJ„ CONCUR.