MAXWELL, J.,
for the Court:
¶ 1. This is our second opportunity to review the chancellor’s award to Alicia Al *639 varado Coggins of (1) periodic alimony and (2) the designation of beneficiary to her ex-husband’s life-insurance policy. When these two awards were first before this court in 2012, we reversed and remanded these issues back to the chancery court. The chancellor followed our mandate. He determined alimony was necessary, even when Alicia’s estate was properly valued, and he explained his reason for requiring Alicia’s ex-husband, Bill Coggins, to maintain life insurance for Alicia’s benefit.
¶ 2. Bill has once again appealed. This time we affirm the portion of the judgment awarding periodic alimony. Satisfied that the chancellor’s determination that Alicia’s separate estate left her in a deficit was not based on a miscalculation, we find no abuse of discretion in his ordering Bill pay Alicia $504 per month in alimony. But we must reverse the portion of the judgment requiring that Bill designate Alicia as beneficiary to one-half of his $350,000 life-insurance policy. Because the purpose of this award is to protect Alicia from Bill falling behind on alimony payments and then dying before catching up, we find requiring Bill to maintain insurance in the amount of almost thirty years worth of alimony payments is excessive. We remand the life-insurance issue back the chancery court for the chancellor to determine an amount commensurate to the interest the policy was designed to protect.
Background
¶ 8. Bill and Alicia separated in 2008. They had been married since 1999 and had one child together, Izabella, who was born in 2008. In 2009, they filed for an irreconcilable-differences divorce, agreeing to divorce and submitting disputed issues to the chancellor. Following the chancellor’s 2010 final judgment of divorce, Bill appealed three issues: (1) the award of periodic alimony to Alicia; (2) the requirement that Bill maintain his $350,000 life-insurance policy and designate Izabella as beneficiary to $175,000 and Alicia as beneficiary to the other $175,000; and (3) the award of child support to Alicia. While this court affirmed the child-support award, we reversed and remanded the other two issues. Coggins v. Coggins (Coggins I), 81 So.3d 285 (Miss.Ct.App.2012).
¶ 4. After our mandate in Coggins I issued, the chancellor held a hearing on the remanded issues. At this hearing, the chancellor took judicial notice of the fact Izabella had been diagnosed with mild autism and required personalized care from Alicia — as this issue had been thoroughly presented at the 2010 divorce hearing. The chancellor also heard more testimony from Alicia about how Izabella’s special needs prevented Alicia, a licensed practical nurse, from working full-time. Because this court’s basis for reversal and remand of the alimony award centered on the chancellor’s failure to consider a $25,000 payment Bill was to make to Alicia as part of their property-settlement agreement, Alicia also offered testimony about the purpose of the $25,000 payment.
¶ 5. Bill’s evidentiary presentation followed two themes. The first was his assertion that Alicia was cohabiting with her boyfriend. And the second centered on his belief that Alicia did not have to be so available to Izabella, whose condition was, in his view, not as severe as Alicia claimed. According to Bill, Izabella could be kept by a number of people, including Alicia’s unemployed brother, so Alicia had no excuse not to work full-time.
¶ 6. At the end of the hearing, the chancellor concluded the purpose of the $25,000 cash payment as part of the property settlement was to equalize Bill’s and Alicia’s separate estates. But even at this higher amount, Alicia’s estate was deficient. The chancellor conducted another Armstrong analysis. Armstrong v. Arm *640 strong, 618 So.2d 1278, 1280 (Miss.1993). Based primarily on the “great disparity” between Bill’s and Alicia’s respective incomes, exacerbated by Alicia’s forgoing income to take care of their special-needs child, the chancellor ordered Bill pay Alicia $504 per month in periodic alimony. He also ordered Bill maintain Izabella’s status as the designated beneficiary to one-half of his $350,000 life-insurance policy and Alicia’s status as beneficiary to the other half.
¶ 7. Bill once again appealed. And once more we review the chancellor’s award of periodic alimony and requirement that Bill designate Alicia as beneficiary to one-half of his life-insurance policy.
Discussion
I. Alimony
¶ 8. “Our scope of review of an alimony award is familiar and well settled. Alimony awards are within the discretion of the chancellor, and his discretion will not be reversed on appeal unless the chancellor was manifestly in error in his finding of fact and abused his discretion.” Armstrong, 618 So.2d at 1280 (internal citations omitted).
¶ 9. Once the marital' property is equitably distributed, “[i]f there are sufficient assets to provide for both parties, then there is no more to be done. But if there is a deficit for one party, the chancellor should consider alimony.” Carter v. Carter, 98 So.3d 1109, 1112 (¶ 8) (Miss.Ct.App.2012) (citing Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994)). The chancellor does this by applying the factors from Armstrong.[1] Armstrong, 618 So.2d at 1280. Here, at the time of the original alimony award, the chancellor determined the agreed-upon division of the marital property left Alicia in a deficit. So after considering the Armstrong factors, he awarded Alicia $570 per month in periodic alimony.
¶ 10. On appeal, this court reversed that award. Coggins I, 81 So.3d at 287 (¶ 1). We found the chancellor had failed to factor in the $25,000 Bill was to pay Alicia as part of the property-settlement agreement. Id. at 288-89 (¶ ¶ 5-12). So because the chancellor’s finding that Alicia’s estate was deficient was based on a miscalculation, we remanded the issue of alimony back to the chancery court. Id.
¶ 11. On rehearing following remand, the chancellor followed our directive. He considered the assets awarded to Alicia through the property-settlement agreement, including the $25,000 Bill was to pay her. And he determined, even when factoring in the $25,000, Alicia was still left with a deficit. So he conducted another Armstrong analysis. The chancellor found there was a “great disparity” in incomes *641 between Bill and Alicia ($6,300 per month versus $2,800), while their expenses were approximately the same. The chancellor found this disparity had been exacerbated by the fact that Alicia, who earns $800 per month as a nurse (versus Bill who earns $450 a day), had forgone a full-time income in order to take care of their autistic daughter. Thus, the chancellor found periodic alimony in the amount of $504 per month was appropriate.
A. Decision to Conduct Armstrong Analysis
¶ 12. In his second appeal, Bill insists the chancellor’s decision to conduct an Armstrong analysis was once again based on a miscalculation. He suggests that, though the chancellor added $25,000 to Alicia’s estate, he neglected to subtract $25,000 from Bill’s, leading to the erroneous conclusion that “the separate estates of the parties at the time of trial [were] approximately of the same value.” Bill points to language in Coggins I:
Using the chancellor’s figures, Alicia’s estate was valued at $25,838.62 less than Bill’s ($162,486.38 versus $188,325). Adding the $25,000 payment to Alicia’s estate would even out the disparity between the values of the parties’ property distribution, giving Alicia’s estate a value of $187,486.38. Less the $25,000, Bill’s estate would be valued at $163,325.
Coggins I, 81 So.3d at 288 (¶ 9). Based on this language, Bill claims the chancellor failed to follow our mandate because he did not acknowledge the effect of the $25,000 payment on Bill’s estate — reducing it to approximately $24,000 less than Alicia’s.
¶ 13. Our specific mandate was “to reverse and remand on the issue of whether an Armstrong analysis and alimony [was] warranted after Bill’s $25,000 payment to Alicia is considered.” Id. At the hearing following remand, the chancellor heard testimony about the $25,000 payment and why it was part of Bill and Alicia’s property-settlement agreement. Alicia testified the payment was to compensate her for a piece of real property, which the parties agreed would go to Bill. This property would eventually appreciate in value based on timber that had been planted but had not yet matured. In other words, the $25,000 represented Alicia’s portion of the eventual sale of the timber. So it was Bill and Alicia’s intention that the property-settlement agreement would create estates of approximately equivalent value. Thus, we find the record on rehearing contains substantial evidence to support the chancellor’s finding that the estates were “approximately the same value.” Instead of violating the mandate from Coggins I, the chancellor’s finding is in line with our finding that “[a]dding the $25,000 payment to Alicia’s estate would even out the disparity between the values of the parties’ property distribution[.]” Id.
¶ 14. Further, it is clear the driving force behind the chancellor’s decision to conduct another Armstrong analysis was not because he deemed the two estates were equal, but instead because he found that Alicia’s estate remained deficient, even when valued $25,000 higher. And $504 per month in periodic alimony was awarded because the chancellor found that, while their expenses were equal, Bill’s income was much greater. See Armstrong, 618 So.2d at 1280 (listing “income and expenses of the parties” as first factor for chancellor to consider when determining alimony).
¶ 15. In Coggins I, we left “the award of alimony itself ... and the respective amount which might be awarded ... to the chancellor’s discretion once he factors in the $25,000 payment to Alicia’s estate.” Coggins I, 81 So.3d at 288 (¶ 8). Confronting this issue again on appeal, we find no *642 abuse of discretion in the chancellor’s decision that an Armstrong analysis was warranted, even after factoring in the $25,000 transfer.

B. Decision to Award Alimony

¶ 16. Bill argues, the alleged miscalculation aside, the chancellor erred by awarding Alicia $504 each month in periodic alimony. He first attacks the chancellor’s findings concerning his and Alicia’s respective incomes and reasonable living expenses. But he does not point to concrete record evidence to show why the chancellor’s factual findings were manifestly wrong or clearly erroneous.
¶ 17. Bill next asserts that the chancellor’s periodic-alimony award is really “post-emancipation child support.” We disagree. Bill and Alicia’s daughter, Iza-bella, is not emancipated and will not be for some time. Instead, she is a minor, who lives in Alicia’s home and, due to her special needs, requires personalized care, which prevents Alicia from working full-time.
¶ 18. One of the Armstrong factors is “[t]he presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care[.]” Armstrong, 618 So.2d at 1280. We find the chancellor appropriately considered this factor, weighing it in favor of Alicia, since she has forgone income to instead care for Izabella when she is not in school and drive her twice a week to out-of-town therapy appointments.
¶ 19. If and when Izabella is able to move out and care for herself, such an event might be a material change in circumstance, possibly warranting modifying or terminating alimony. See Armstrong, 618 So.2d at 1281. But that day has not yet come, so Bill’s complaint of “post-emancipation child support” is premature.
¶ 20. The chancellor’s award of $504 per month in periodic child support was based on an on-the-record analysis of the Armstrong factors, none of which we find were misapplied or unsupported by the evidence. So we affirm the alimony award.
¶ 21. Bill has asked for a “credit” for what he deems an “overpayment of alimony” because from the time of the original divorce judgment to the order following rehearing he had paid Alicia $570 monthly “despite the reversal by the Court of Appeals.” But in reversing, we were clear that whether alimony was warranted and, if so, by what amount was within the discretion of the chancellor. Coggins I, 81 So.3d at 288 (¶ 8).
¶ 22. On remand, the chancellor determined that, whether valued at $187,000 or $162,000, Alicia’s estate was deficient and alimony was warranted. The figure of $570 per month was based on Bill’s and Alicia’s incomes and expenses and the disparities between the two at the time of the divorce. The new alimony figure of $504 per month was based on their incomes and expenses in 2012. So it was the change in their circumstances, not the fact that the original alimony award had been reversed, that warranted the decrease in alimony. For this reason, no credit is warranted.
II. Alleged Cohabitation
¶ 28. Regardless of the propriety of the alimony award, Bill argues the chancellor still should have terminated the periodic-alimony award based on Alicia’s cohabitation with her boyfriend.
¶ 24. While periodic alimony automatically terminates when the paying spouse dies or the recipient spouse dies or remarries, the chancellor has authority to modify (up or down) or terminate periodic alimony “in the event of a material change *643 of circumstances subsequent to the decree awarding alimony[.]” Armstrong, 618 So.2d at 1281 (citations omitted). And “the existence of a situation of mutual support between the recipient spouse and another individual which alters the recipient spouse’s financial needs” is such a material change in circumstances justifying modification or termination of periodic alimony. Scharwath v. Scharwath, 702 So.2d 1210, 1211 (¶ 6) (Miss.1997).
¶ 25. Mutual support may arise in two situations — (1) the recipient spouse’s cohabitation with another individual or (2) the recipient spouse’s “de facto marriage.” Deborah H. Bell, Mississippi Family Law § 9.10[2] (2005).

A. Cohabitation and the Presumption of Support

¶ 26. Bill claims the first circumstance — that Alicia and her boyfriend live together and mutually support each other — requires we reverse the alimony award.
¶ 27. There is indeed a general presumption that, where there is cohabitation, there is also mutual support. Scharwath, 702 So.2d at 1211 (¶ 7); see also Pritchard v. Pritchard, 99 So.3d 1174, 1177 (¶ 20) (Miss.Ct.App.2012). This presumption is based on two considerations. One is “the difficulty a providing spouse faces in presenting direct evidence of mutual financial support between cohabiting parties.” Scharwath, 702 So.2d at 1211 (¶ 7). And the second consideration stems from the notion that “parties who live in cohabitation can easily and purposely keep their condition of mutual financial support concealed from the paying spouse, as well as from courts seeking only financial documentation before [granting] a modification.” Id. So if an alimony-paying spouse proves his former spouse is cohabiting, then the burden is on “the recipient spouse to come forward with evidence suggesting that there is no mutual support[.]” Id. But in this case, the chancellor found Bill failed to prove Alicia cohabited with her boyfriend, so the mutual-support presumption did not arise.
¶ 28. Bill’s main evidence of cohabitation was that he often saw Alicia’s boyfriend’s vehicle at the house during late-night or early-morning hours. While both Alicia and her boyfriend acknowledged he spent one or two nights a week at her house, both testified he did not live at her house. Both maintained that the boyfriend kept his own residence elsewhere, had no personal items at Alicia’s house, and never contributed financially or in-kind to Alicia’s household maintenance. From this testimony, the chancellor found Alicia was not cohabiting with her boyfriend. The chancellor further found that, even if Alicia and her boyfriend’s relationship could be considered as one of cohabitation — thus triggering the mutual-support presumption — Alicia had rebutted the presumption and shown there was in fact no mutual support.
¶29. “The chancellor’s findings of fact about cohabitation, de facto marriage, and mutual support ‘are entitled to substantial deference when reviewed on appeal.’” Pritchard, 99 So.3d at 1177 (¶ 19) (quoting Pope v. Pope, 803 So.2d 499, 504 (¶ 13) (Miss.Ct.App.2002)). In this case, the chancellor found there was neither cohabitation nor mutual support to justify terminating Bill’s alimony obligation. While Alicia and her boyfriend spent time together — during the day and some nights — and shared an occasional meal together, we find nothing in the record to conclude the chancellor’s findings on this issue were manifestly wrong or clearly erroneous.

B. De Facto Marriage

¶ 30. Neither are we persuaded by Bill’s insistence that our finding of a de *644 facto marriage in our recent Pritchard opinion directs us to reverse and render this case.
¶ 31. In Pritchard, the former spouses had entered into a settlement agreement in which the husband would pay the wife alimony until either died or the wife remarried. Pritchard, 99 So.3d at 1175 (¶ 3). After the divorce, the former wife admittedly had lived with her boyfriend for several years, moving three times with him, even out-of-state, all the while consciously avoiding the appearance of living like husband and wife, so as not to put her alimony payments in jeopardy. Id. at 1175-76 (¶ ¶ 6-12). We found the wife could not have her proverbial cake and eat it too. She could not “structure her relationship with [her live-in boyfriend] so she could receive the benefits of the relationship with some semblance of respectability and at the same time continue her alimony payments from [her former husband].” Id. at 1179 (¶ 27). Since the former wife’s relationship with her boyfriend was a “de facto marriage,” we held that the former husband was released from his obligation to pay alimony under the settlement agreement. Id. at (¶ 29).
¶ 32. But here, we find no evidence that Alicia has been “avoiding marriage to continue alimony.” Bell, Mississippi Family Law § 9.10[2][b]. “The law is, in effect, that if the alimony recipient and another individual have so fashioned their relationship, to include their physical living arrangements and their financial affairs, that they could reasonably be considered as having entered into a de facto marriage, then the obligor may be relieved of his obligation to pay alimony the same as if his former spouse had entered into a de jure marriage.” Pope, 803 So.2d at 504 (¶ 12) (citing Scharwath, 702 So.2d at 1211 (¶ ¶ 6-7)). Based on the evidence, the chancellor concluded Alicia and her boyfriend had not “so fashioned their relationship.” They neither structured their living arrangements nor arranged their financial affairs so that they were, for all practical purposes, married. We find no abuse of discretion in this conclusion.
III. Life Insurance
¶ 33. While we affirm the award of continued periodic alimony, we must reverse and remand the portion of the chancellor’s order requiring Bill to designate Alicia a beneficiary to one-half of his $350,000 life-insurance policy. Requiring Bill maintain $175,000 in life insurance for Alicia’s behalf is “excessive considering its purpose.” Johnson v. Pogue, 716 So.2d 1123, 1134 (¶ 41) (Miss.Ct.App.1998).
¶ 34. In Coggins I, we reversed and remanded this portion of the divorce judgment because “the chancellor did not specifically explain the reason for his ruling” and because “the award of alimony may be changed on remand[.]” Coggins I, 81 So.3d at 290 (¶ 15). On rehearing, the chancellor once again ordered Alicia be listed as a beneficiary to one-half of the insurance proceeds, or $175,000. This time the chancellor was explicit in his reasoning, which was “to insure the payment of alimony in order to compensate [Alicia] and allow her to survive” if Bill predeceased her.
¶ 35. An alimony payor “may be required to maintain life insurance in an amount sufficient to satisfy payment of alimony obligations that survive the pay- or’s death.” Bell, Mississippi Family Law § 9.08[4][c] (citing In re Estate of Hodges, 807 So.2d 438, 442-44 (¶ ¶ 14-23) (Miss.2002)). The key phrase is “alimony obligations that survive the payor’s death.”
¶ 36. Periodic alimony is an obligation that “terminates automatically” upon the payor’s death and cannot be im *645 posed upon the payor’s estate, absent an express agreement. Armstrong, 618 So.2d at 1281; see In re Hodges, 807 So.2d at 443 (¶ 19). While lump-sum alimony fully vests at the time of the divorce judgment, periodic alimony only vests on the date each payment becomes due. In re Hodges, 807 So.2d at 442 (¶ 17). So when the payor dies, the only alimony obligations that survive — and the only obligations that may be insured — are unpaid lump-sum alimony and unpaid periodic-alimony payments that have already vested.
¶ 37. Recognizing the possibility that an alimony payor may fall behind in periodic-alimony payments and then die leaving those vested payments unsatisfied, this court has acknowledged the chancellor’s authority to require the alimony payor to maintain a life-insurance policy to protect the recipient spouse against such a contingency. Pogue, 716 So.2d at 1134 (¶ 41); see also Beezley v. Beezley, 917 So.2d 803, 808 (¶ 17) (Miss.Ct.App.2005). But in Po-gue, this court found that requiring the payor to maintain a $75,000 life-insurance policy to protect against the potential failure to make $500-per-month alimony payments was “excessive.” Pogue, 716 So.2d at 1134 (¶ 41).
¶ 38. How much more excessive then is the requirement that Bill designate Alicia as the beneficiary to $175,000 in life-insurance proceeds to protect against Bill defaulting on his $504-per-month alimony payments and then dying before curing the default. This amount of insurance — the equivalent of thirty years worth of alimony payments — assumes not only that Bill may fall behind for three decades but also that Alicia will experience no material change of circumstances altering or terminating her need for alimony. Such an amount is unreasonable. Even when we factor in the unpaid portion of the $25,000 hybrid property-settlement/lump-sum alimony obli-
gation that has vested to Alicia, we find requiring Bill designate Alicia receive seven times that amount upon his death is still excessive.
¶ 39. We remand for the chancellor to consider whether requiring Bill to designate Alicia as a beneficiary is necessary to protect against the alimony obligations that may survive Bill’s death. If the chancellor determines the designation is necessary, he should require Bill to designate Alicia as beneficiary to a portion commensurate to those potential obligations.
¶ 40. As Bill has not appealed the portion of the order that requires Bill to designate Izabella as the beneficiary to the other $175,000 in life-insurance proceeds, our holding does not disturb the requirement that Bill maintain life insurance and designate Izabella as a beneficiary to that amount.
¶ 41. In conclusion, we affirm the portion of the chancellor’s judgment ordering Bill to continue to pay alimony at the reduced amount of $504 per month, but we reverse and remand the portion of the judgment ordering Bill to designate Alicia as beneficiary to a one-half interest in his $350,000 life-insurance policy.
¶ 42. THE JUDGMENT OF THE MONTGOMERY COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE DIVIDED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEE.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, FAIR AND JAMES, JJ., CONCUR. IRVING, *646 P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.

. In Armstrong, the Mississippi Supreme Court set forth the following factors for the chancellors to consider "in arriving at findings and entering judgment for alimony”:
1. The income and expenses of the parties;
2. The health and earning capacities of the parties;
3. The needs of each party;
4. The obligations and assets of each party;
5. The length of the marriage;
6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;
7. The age of the parties;
8. The standard of living of the parties, both during the marriage and at the time of the support determination;
9. The tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party; or
12. Any other factor deemed by the court to be "just and equitable” in connection with the setting of spousal support.
Armstrong, 618 So.2d at 1280 (citations omitted).