## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01903-COA

**CHARLES H. GRINER, JR.**                                        **APPELLANT**

**v.**

**MELANIE GRINER**                                                **APPELLEE**

DATE OF JUDGMENT:              08/28/2015
TRIAL JUDGE:                   HON. JOHNNY LEE WILLIAMS
COURT FROM WHICH APPEALED:     MARION COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:        S. CHRISTOPHER FARRIS
ATTORNEYS FOR APPELLEE:        RICHARD ANTHONY FILCE
                               ERIK M. LOWREY
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:       AWARDED WIFE SEVENTY PERCENT OF
                               MARITAL ESTATE AND LUMP-SUM
                               ALIMONY
DISPOSITION:                   REVERSED AND REMANDED – 06/27/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., BARNES AND WESTBROOKS, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.     The Marion County Chancery Court granted Charles Griner (Chip) and Melanie Griner an irreconcilable-differences divorce and, pursuant to the parties' agreement, resolved the issues that they were not able to resolve. Chip, being dissatisfied with the chancellor's resolution of those issues, appeals and specifically asserts that the chancellor erred with respect to the following issues: (1) the division of the marital estate, (2) the assignment of responsibility for the marital debts, (3) the award of lump-sum alimony to Melanie, (4) and (5) other awards which exceed the scope of the issues that he and Melanie requested the court

to address.  Finding error in the chancellor's evaluation of the marital estate, we reverse and remand for further proceedings.

FACTS

¶2.     Melanie and Chip married on August 11, 1990, and later had two children, Natalie and Charlie.[1]  During the course of the marriage, Chip obtained a business degree from the University of Mississippi, while Melanie, with Chip's consent, chose to stay home and care for the couple's two children.  Melanie never worked outside of the home, apart from briefly helping her mother with a drapery business.  Chip provided the family's primary source of income through his position as a bank director and his participation in the "family business."[2]  As part of his involvement in one of the family-owned companies, Griner Energy, Chip came to own a twenty-five-percent interest in a condominium[3] in Destin, Florida, and the remaining seventy-five-percent interest was owned by Chip's mother and two siblings.  Additionally, Chip held a sizeable estate in the form of stocks.  He contends that many were gifted to him by his grandparents prior to the marriage, while others were purchased in both Melanie and his names during the marriage.

---

[1] At the time the judgment of divorce was entered, Natalie was twenty-one years old and Charlie was eighteen years old.

[2] The "family business," as it is referenced throughout the record, appears to encompass numerous family-owned business interests, including Griner Drilling Services, Inc.; Griner Family Limited Partnership; Griner Oil and Gas Company, Inc.; Griner Real Estate, LLC; and Griner Energy.

[3] Chip asserts that the family used the condominium "once[,] maybe twice a year" during the course of the marriage, while Melanie argues that they used the condominium "at least twice per year, every year, during the marriage."

¶3. Melanie and Chip separated on or about September 30, 2010. On September 22, 2011, the chancery court entered a temporary order, requiring Chip to pay $7,000 per month as support and private-school tuition for Charlie. Shortly thereafter, Chip filed a motion for relief from the temporary order, claiming that the $7,000-per-month figure had been erroneously calculated to include "'phantom income' in the form of dividends from bank stocks, capital gain year[-]end [income] and rental income," which resulted in "a skewed monthly income" for him. The chancellor denied Chip's motion.

¶4. On February 3, 2012, Melanie filed a motion for appointment of a financial expert due to Chip's "substantial [and] extremely complex" assets. Melanie asserted in the motion that she had no assets in her own name, as they were all titled in Chip's name. The court granted Melanie's motion and appointed Jim Koerber of The Koerber Company, P.A., "to determine valuation of assets of the parties, specifically the corporations of [Chip] and the cash flow derived therefrom," and "to prepare a report for the [c]ourt."

¶5. On April 14, 2015, the parties filed a written consent, wherein they agreed to a divorce on the ground of irreconcilable differences, but asked the chancellor to decide the following issues: (1) child support and related school issues and costs; (2) alimony; (3) equitable distribution of the marital assets; and (4) equitable distribution of the parties' debts and liabilities.[4] The court conducted a one-day trial on November 13, 2014, during which Koerber testified as to Chip's finances. During his testimony, Koerber classified stocks as

[4] Melanie and Chip also requested that the chancellor decide the following: (a) legal and physical custody of Charlie; (b) tax deductions as they pertain to Natalie and Charlie; and (c) attorneys' fees. However, as these issues are not being contested on appeal, we do not address them in our discussion.

either marital or nonmarital; Koerber also calculated Chip's gross income to be $354,044 annually.[5]  At the end of the trial, the chancellor entered a final judgment, the contents of which we summarize as follows:

1.  *Child support and related school issues and costs:* The court held that, based on the past twelve years, Chip earned an average adjusted gross income of somewhere between $275,000 and $325,000, annually. Based on this amount of income, the court instructed Chip to pay Melanie $1,500 per month in child support for Charlie.  The court also required Chip to continue to provide health insurance for Charlie until he is emancipated.  The court held that Chip and Melanie would divide equally all of Charlie's non-covered medical expenses.

2.  *Alimony:* The court applied the *Armstrong*[6] factors and required Chip to pay Melanie periodic alimony in the amount of $3,000 per month until her death or remarriage.  The court also ordered Chip to pay Melanie an additional $4,000 per month for ten years, or a lump sum in the amount of $480,000.  The court further required Chip to provide Melanie with health insurance benefits for the next eighteen years.

3.  *Equitable distribution of the marital assets:* The court conducted a *Ferguson*[7] analysis of the marital assets and, based on the stipulations of the parties and Koerber's testimony, determined that the following property was marital and awarded Melanie seventy percent of it: the home and the land surrounding it; the Florida condo, described as Unit 1401 at Emerald Towers; "any business holdings;" Citizens Bank stock; First Federal Bank stock; Griner Drilling 401(k); and the AG Edwards IRA.  The court also awarded Melanie a 2007 Chevrolet Tahoe and all the household furnishings and personal property, but awarded Chip the exclusive use and possession of the marital home until he purchased Melanie's interest in it.  The court held that Melanie and Chip would keep their own checking accounts, including the balances therein.  The

---

[5] Chip asserts here, as he did in his motion for relief from the temporary order, that this figure is inaccurate because it accounts for "phantom income."  Chip reiterates this argument throughout his appeal.

[6] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

[7] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

4

court concluded by asserting that, in rendering its decision, it took into account Chip's nonmarital assets, which totaled over $7,000,000 and left Chip in a "far superb" position than Melanie.

The final judgment did not specifically address equitable distribution of the parties' debts and liabilities.

¶6.    Both Chip and Melanie filed motions for a new trial or for reconsideration of the court's final judgment. In response, the court entered a modified order, which we summarize as follows:

1.    *Child support and related school issues and costs:* The court denied Chip's request to reduce the amount of child support he was required to pay for Charlie. The court additionally required Chip to pay for the "maintenance, upkeep, tags, and insurance" costs for Charlie's vehicle until Charlie reached twenty-one years of age.

2.    *Alimony:* The court denied Chip's request to reduce the lump-sum alimony-award he was ordered to pay to Melanie, as well as his request to modify the provision of the final-judgment requirement that he provide Melanie with health insurance for the next eighteen years. Additionally, the court required Chip to make Melanie the beneficiary of a $1 million life-insurance policy.

3.    *Equitable distribution of the marital assets:* The court clarified that Melanie would receive seventy percent of the following marital assets: the house and surrounding land (except for some acreage nearby which the court found to be nonmarital and belonging to Chip), with a combined total value of $762,500; Chip's twenty-five-percent interest in the Florida condominium, valued at $231,250; and the retirement accounts—being the AG Edwards IRA, valued at $48,517.96; Griner Drilling Services 401(k), valued at $215,068; and the AG Edwards investment account, valued at $978. The court clarified that Chip's interest in the corporations and business holdings, listed on the *Hemsley* report were nonmarital; as such, that interest and the tax benefits would belong to Chip. The court, relying on Koerber's report, also held that the following shares of stock in each corporation would be considered marital property and therefore subject to distribution: forty-four shares of Citizens Bank Corporation at $65 per share, with a value of $2,860;

5

and 6505 shares of First Federal Bancorp at $35 per share, with a value of $227,675. The court found that Melanie was entitled to seventy percent of those shares of stock. The court found that the following shares of stock were nonmarital and would, therefore, belong to Chip: 11,496 shares of Citizens Bank Corporation at $65 per share, with a value of $747,240; and 31,401 shares of First Federal Bancorp at $35 per share, with a value of $1,099,035.

Additionally, the court held that Chip would be liable for all of the debts of the marriage as set out in the *Hemsley* report, pursuant to *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994), and the 8.05 financial statements of the parties. The court noted that a large amount of the debt reflected by Chip had to do with his corporate debt and was outside the scope of the court's jurisdiction, as Chip was awarded one hundred percent of the interest in his business; thus, the debts of those corporations were nonmarital and not subject to the court's division. The court did, however, order Melanie to pay the interest on a family Citibank credit card with a balance of $23,000; the court ordered Chip to pay Melanie $18,000 for the purpose of alleviating that debt (as the card had a balance of $18,000 at the time of the temporary order). The court also assessed the debt of the home and surrounding acreage to Chip, and extended the period of time that Melanie had to secure a new home. Chip appeals.

DISCUSSION

¶7.    "Our scope of review in domestic relations matters is limited under the familiar rule that this Court will not disturb a chancellor's findings unless [they are] manifestly wrong [or] clearly erroneous, or . . . the chancellor applied an erroneous legal standard." *Johnson v. Johnson*, 650 So. 2d 1281, 1285 (Miss. 1994). The chancellor's division and distribution of property "will be upheld if it is supported by substantial credible evidence." *Carrow v.*

*Carrow*, 642 So. 2d 901, 904 (Miss. 1994).  This Court has previously reiterated the well-settled premise that

> [a]ll property division, lump[-]sum or periodic alimony payment, and mutual obligations for child support should be considered together.  Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce.  Therefore, where one expands, the other must recede.

*Clark v. Clark*, 43 So. 3d 496, 502 (¶25) (Miss. Ct. App. 2010) (citation omitted).

### (1)    *Property Distribution*

¶8.    Chip argues that the chancellor erred in his distribution of the couple's property in several ways.  First, Chip asserts that the chancellor's distribution of seventy percent of the marital assets—in the form of the marital home and marital stock—was erroneous because the chancellor failed to discount the assets for outstanding loan balances.  Next, Chip argues that the chancellor erred in failing to equitably divide the substantial marital debts of the parties.  Finally, Chip argues that the chancellor erred in awarding Melanie seventy percent of Chip's twenty-five-percent interest in the Florida condominium, because the condominium was not marital property.

¶9.    Mississippi law requires equitable distribution of the marital estate during divorce proceedings.  *Owen v. Owen*, 798 So. 2d 394, 399 (¶14) (Miss. 2001).  "In determining equitable distribution of marital assets and debts, the chancellor must first classify each asset as marital or non-marital."  *Walker v. Walker*, 36 So. 3d 483, 487 (¶12) (Miss. Ct. App. 2010) (citing *Hemsley*, 639 So. 2d at 915).  In *Hemsley*, 639 So. 2d at 914, the court defined "marital property" as "[a]ssets acquired or accumulated during the course of a marriage."

7

Such marital property is subject to equitable division "unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Id*. "Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." *Ferguson*, 639 So. 2d at 929. "[I]n defining and distributing marital assets, the couple's net assets should be considered; that is, the indebtedness owed against such asset should ordinarily be deducted from its fair market value." *Hemsley*, 639 So. 2d at 920 (citation and internal quotation marks omitted).

¶10.     "Whether a debt is classified as marital or separate depends on who benefitted from the debt." *Walker*, 36 So. 3d at 487 (¶12) (citing *Fitzgerald v. Fitzgerald*, 914 So. 2d 193, 197 (¶21) (Miss. Ct. App. 2005)). "The courts in this state have consistently held that expenses incurred for the family, or due to the actions of a family member, are marital debt and should be treated as such upon dissolution of the marriage." *Shoffner v. Shoffner*, 909 So. 2d 1245, 1251 (¶17) (Miss. Ct. App. 2005) (citation omitted).

¶11.     Once property is classified as marital or nonmarital, "the chancellor must evaluate the equitable division of all marital property pursuant to the guidelines listed in *Ferguson*," which are:

> 1.      Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows: a. Direct or indirect economic contribution to the acquisition of the property; b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets[;]

8

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise[;]

3. The market value and the emotional value of the assets subject to distribution[;]

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Walker*, 36 So. 3d at 487 (¶12); *Ferguson*, 639 So. 2d at 928. "Marital debt lies within the factors set forth in *Ferguson*, as it may be defined as an 'economic consequence' or as 'any other factor which in equity should be considered.'" *Cuccia v. Cuccia*, 90 So. 3d 1228, 1233 (¶12) (Miss. 2012) (citation omitted).

¶12.    In addition to applying the *Ferguson* factors, "[c]ontributions and fault should be considered by the chancellor in determining equitable distribution of a marital estate." *Singley v. Singley*, 846 So. 2d 1004, 1008 (¶10) (Miss. 2002). "[A]n equitable division of property does not necessarily mean an equal division of property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). "When the facts and circumstances warrant an

equitable division of the marital estate of one-half or greater and such a division complies with the *Ferguson* principles, then we are duty bound to let such a distribution stand." *Phillips v. Phillips*, 904 So. 2d 999, 1003 (¶13) (Miss. 2004).

### a. Marital Assets

¶13. Chip first argues that the chancellor erred in failing to make specific findings as to the marital estate and which assets were marital or nonmarital. We find this argument without merit. As noted above, the chancellor provided in his final judgment and further clarified in the modified order which assets were marital and which would go to Chip or Melanie as separate property.

¶14. Next, Chip argues that the chancellor's award of seventy percent of the marital assets to Melanie was erroneous because the chancellor failed to discount those marital assets for outstanding personal-loan balances[8] prior to making the award. In other words, the chancellor erroneously awarded Melanie seventy percent of the *gross* value of the marital assets rather than seventy percent of the *net* value. Melanie, in response, argues that the chancellor's award was justifiable, given the fact that Chip possessed a sizeable nonmarital estate and ultimately caused the dissolution of the marriage because of his alcohol addiction.

¶15. In the final judgment, the chancellor properly discussed each *Ferguson* factor and methodically explained why he decided to award Melanie seventy percent of the marital

---

[8] Chip maintains that the loans from Griner Drilling Service were taken out for personal reasons, not business reasons, as they were for payment to the rehabilitation center, treatment for alcoholism, and investment loans and losses.

10

assets.[9] The chancellor further reiterated his reasoning for his decision in the modified order. Unfortunately, however, the chancellor included incorrect figures in his calculations. While the *Hemsley* report, included in the record as exhibit 8, assesses the value of the marital home and fifteen acres, plus the adjacent twenty-five acres, at $762,500, it also shows that the marital home is encumbered by a $328,000 mortgage, leaving only $372,000 in equity. This figure, combined with the $62,500 value of the adjacent twenty-five acres, results in a figure of $434,500 for purposes of marital division.

¶16.    The chancellor, in the final judgment and again in the modified order, valued the marital home at $700,000. In the modified order, the chancellor remarked additionally that the adjacent twenty-five acres were valued at $62,500, and valued the combined properties at $762,500. However, these figures were erroneous; the chancellor should have awarded Melanie seventy percent of $434,500, which was the amount of equity in the properties, rather than seventy percent of  $762,500. Thus, we reverse and remand on this issue, so the chancery court may reconsider the division of the marital estate based on a proper evaluation of it.

¶17.    Chip also argues that chancellor erred in awarding Melanie seventy percent of the value of the shares of First Federal Bancorp stock, because he failed to consider the outstanding loan of $87,600 used to purchase the stock. Thus, Chip asserts that the net value

_____

[9] In sum, the chancellor made his determination on the basis that Chip held nonmarital assets which put him in a better position than Melanie, even after an award of seventy percent of the marital assets. Additionally, the chancellor noted that Melanie had never developed skills to suddenly be forced into the workplace, and that Chip's alcoholism had ultimately led to the downfall of the marriage.

of the stock is $140,075, and Melanie should have been awarded only seventy percent of that figure, rather than seventy percent of $227,675.

¶18. At trial, Koerber, while testifying about the marital stock, physically wrote on the *Hemsley* report that the marital shares of First Federal Bancorp stock totaled $227,675. He did not mention, nor was he questioned about, this purported purchase-money loan of $87,600. Interestingly, Chip's 8.05 financial statement does not show such a loan. The only evidence in the record indicating that Chip took out any sort of loan for purchasing marital stocks is found in his 8.05 financial statement, wherein he listed a liability to First Southern Bank for "personal reasons" in the amount of $187,790, and another liability to First Southern Bank for Citizens Bank stock in the amount of $84,224. There is insufficient evidence in the record to show that the distribution of marital stock was in error; thus, we find this issue without merit.

### b. Marital Debts

¶19. Next, Chip argues that the chancellor erred in failing to equitably divide the substantial marital debts of the parties. Specifically, Chip asserts that the chancellor erred in requiring him to pay one-hundred percent of the marital debts, in addition to paying Melanie seventy percent of the gross value of the marital home and the marital stocks without deducting the outstanding indebtedness as to each. Chip also argues that the chancellor failed to make specific findings about the marital debts, other than simply requiring him to pay all of them.

¶20. As stated, the chancellor in the modified order provided that Chip was liable for all

marital debts set forth in the *Hemsley* report and 8.05 financial statements, in addition to the corporate debts on his personal, nonmarital assets.[10]  As the modified order specifically referenced the marital debts listed in those documents and commented on the status of those debts as either marital or corporate and thus belonging to Chip, we do not find that the chancellor failed to make specific findings about the debts.  Therefore, we also find no error in the chancellor's assigning responsibility for payment of the debts to Chip in light of Chip's substantial separate income and earning potential. This issue is without merit.

### c. Condominium

¶21.    Chip argues that the chancellor erred in awarding Melanie seventy percent of his twenty-five-percent interest in the Florida condominium because, in his view, this asset was clearly nonmarital property.  However, Chip received the deed to the condominium during his marriage to Melanie.  Both he and Melanie assert that it was used by their family at least once a year.  Based upon these facts, we find no error with the chancellor's finding that the condominium was marital property.

### (2) Alimony

¶22.    Chip asserts that the chancellor abused his discretion in awarding Melanie lump-sum alimony, because Melanie did not suffer a deficit after distribution of the marital estate. Additionally, Chip asserts that the court erroneously found that his nonmarital assets totaled over $7,000,000.

¶23.    "Alimony awards are within the discretion of the chancellor . . . and his discretion will

---

[10] In his appeal, Chip states that Griner Energy had to borrow money to sustain itself before it finally failed, and that he and his siblings are now repaying that debt obligation.

not be reversed on appeal unless the chancellor was manifestly in error in his finding of fact and abused his discretion." *Armstrong*, 618 So. 2d at 1280. "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003).

¶24. Since we are reversing because of the chancellor's error in valuing the marital home, the chancellor will have to take a new look at the alimony award because alimony cannot be considered until after the marital estate has been properly valued and equitably divided. However, we note that the error in valuing the marital home results in a reduction in the value of the marital estate, and we already have found no issue with the chancellor awarding Melanie seventy percent of the marital estate based on an erroneous, but higher, valuation figure for the marital estate.

### (3) Health Insurance, Life Insurance, and Automobile Tag, Insurance, and Maintenance

¶25. Finally, Chip asserts that the chancellor erred in addressing issues which were not authorized by both parties' consent. Specifically, Chip argues that the chancellor had no authority to award Melanie health-insurance coverage for eighteen years; to require him to obtain life-insurance coverage; and to require him to pay for the insurance, tag, and maintenance on his son's vehicle. In response, Melanie argues that these issues were subsets of those presented for decision by the chancellor.

¶26. As noted in the facts portion of the opinion, Melanie and Chip submitted, among other issues, the issues of child support and related school issues/costs, and the equitable distribution of the parties' debts/liabilities.

14

### a. Health Insurance

¶27. The chancellor did not exceed the authority granted by Chip and Melanie when he addressed Melanie's health insurance. "Medical insurance is an award in the nature of alimony." *Moore v. Moore*, 803 So. 2d 1214, 1220 (¶23) (Miss. Ct. App. 2001). The parties submitted the issue of alimony to the chancellor for resolution. However, we note that the chancellor's final judgment and the modified order clarifying the final judgment contain conflicting provisions with respect to the period of time that Chip would be required to maintain health insurance for Melanie. First, in the final judgment in section III, the chancellor ordered Chip to provide Melanie with health-insurance benefits for the next *eighteen years*, but in the conclusion portion of the judgment, the chancellor stated that Chip was required to provide Melanie with health-insurance benefits for the next eighteen *months*. Later, in the modified order, the chancellor stated that Chip was required to provide Melanie with health-insurance benefits for the next eighteen *years*. It is obvious that the chancellor made a scrivener's error somewhere, but we cannot be certain where, although it appears likely that the scrivener's error lies in the eighteen-year wording. Nevertheless, prudence requires us to reverse and remand this issue for clarification.

### b. Life Insurance

¶28. We also find that the chancellor operated within the authority granted to him by the parties' submission of the issue of alimony when he ordered Chip to maintain a life-insurance policy with Melanie designated as the beneficiary. Mississippi Code Annotated section 93-5-23 (Rev. 2013) provides that, when granting a divorce, a chancellor

15

may, in [his] discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders . . . touching the maintenance and alimony of the wife or the husband, or any allowance to be made to her or him, and shall, if need be, require bond, sureties or other guarantee for the payment of the sum so allowed.

Miss. Code Ann. § 93-5-23. This Court has held that "[a]n alimony payor may be required to maintain life insurance in an amount sufficient to satisfy payment of alimony obligations that survive the payor's death." *Coggins v. Coggins*, 132 So. 3d 636, 644 (¶35) (Miss. Ct. App. 2014) (citations and internal quotations omitted). "Recognizing the possibility that an alimony payor may fall behind in periodic-alimony payments and then die leaving those vested payments unsatisfied, this court has acknowledged the chancellor's authority to require the alimony payor to maintain a life-insurance policy to protect the recipient spouse against such a contingency." *Id*. at 645 (¶37); *see also Johnson v. Pogue*, 716 So. 2d 1123, 1134 (¶41) (Miss. Ct. App. 1998); *Beezley v. Beezley*, 917 So. 2d 803, 808 (¶17) (Miss. Ct. App. 2005).

¶29. While we find that the chancellor was within the authority granted him by the parties when he ordered Chip to maintain a life-insurance policy with Melanie named as the beneficiary, we also find that the amount that Chip was required to maintain—$1,000,000— was unreasonable and excessive. The purpose of requiring an alimony payor to maintain a life-insurance policy with the alimony payee designated as the beneficiary is to protect the vested but unpaid amount of alimony in case of the payor's death.

¶30. In *Coggins*, we held that the chancellor erred in his requirement that the husband designate his former wife as the beneficiary to a $175,000 life-insurance policy "to protect

16

against [the husband] defaulting on his $504-per-month alimony payments and then dying before curing the default." *Coggins*, 132 So. 3d at 645 (¶38). We reasoned that "[t]his amount of insurance—the equivalent of thirty years worth of alimony payments—assumes not only that [the husband] may fall behind for three decades but also that [his former wife] will experience no material change of circumstances altering or terminating her need for alimony." *Id*.

¶31. Here, with respect to the protection of the alimony awarded to Melanie, the chancellor stated in the modified order:

> The [c]ourt failed [in its final judgment] to ensure that the amount of alimony awarded to Melanie [was] covered by insurance and hereby directs Chip to change the beneficiary on his $1,000,000.00 life insurance policy to make the same payable to Melanie for the performance of the [j]udgment of the [c]ourt in case of Chip's death.

As noted earlier in this opinion, the chancellor awarded Melanie periodic alimony of $3,000 a month, as well as lump-sum alimony of $480,000, or $4,000 a month for ten years. Although Chip was allowed to pay the lump-sum alimony in installment payments, the full amount vested immediately. Only a $480,000 policy would be required to guarantee payment of the lump-sum alimony. If Chip immediately paid his lump-sum-alimony obligation in a single payment, he would have to fail making his monthly periodic-alimony payments for more than twenty-seven years to accumulate a $1,000,000 arrearage. And if Chip chose to pay his lump-sum-alimony obligation in installment payments, along with his periodic-alimony payments, and failed to make any payments for ten years, he would be in arrears by only $840,000, not counting any accrued interest. It is unreasonable to assume that

17

Melanie would allow the payments to get that far behind before seeking judicial redress. Moreover, it is not unreasonable that Melanie may remarry, at which time Chip's periodic-alimony obligation would cease. Since we are already reversing on other grounds, we direct that on remand the chancellor take a new look at the amount of life insurance that will be required to protect Melanie's alimony interest.

### c. Charlie's Automobile Tag, Maintenance, and Insurance

¶32. Like awards of alimony, "the court may, in its discretion, . . . make all orders touching the care, custody and maintenance of the children of the marriage." Miss. Code Ann. § 93-5-23. "Child support can include life and health insurance, college tuition, and other related needs. A party need not specifically request each form of child support ultimately awarded by a chancellor if child support in general is requested." *Massey v. Huggins*, 799 So. 2d 902, 910 (¶30) (Miss. Ct. App. 2001) (internal citation omitted). However, this does not give the chancellor full reign to consider any and every issue that might possibly fall under the category of child support. Here, the parties expressly consented to the court's disposition of the issue of "child support and related school issues/costs."

¶33. The record is devoid of any discussion regarding Charlie's car other than that Chip purchased the car for Charlie and that it was titled in Chip's name. Under Mississippi law, it is illegal to operate a vehicle upon the roadways of this state without a tag and liability insurance. So when Chip purchased the vehicle for Charlie, he knew that it had to be tagged and insured. While maintenance on the vehicle is not required by state law, Charlie also knew that if he wanted the vehicle to remain usable, it would from time to time require some

maintenance. Without more information in the record as to why Chip purchased the car for Charlie, we cannot say with confidence that the chancellor was authorized to assess responsibility for the tags, insurance, and maintenance of Charlie's vehicle to Chip under the issue of "child support and related school issues/costs." However, the parties also submitted the issue of debts and liabilities to the chancellor for resolution. Clearly, the state-law requirement that the vehicle not be driven upon the roadways without a tag and liability insurance implicates the liabilities issue submitted to the chancellor for resolution. Consequently, we cannot find that the chancellor exceeded the authority given him by assigning responsibility for the expenses associated with Charlie's car. This issue is without merit.

¶34. For the reasons discussed, we reverse and remand for further proceedings consistent with this opinion.

¶35. **THE JUDGMENT OF THE MARION COUNTY CHANCERY COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., BARNES, ISHEE, GREENLEE AND WESTBROOKS, JJ., CONCUR. WILSON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON AND FAIR, JJ., NOT PARTICIPATING.**