# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00815-COA

**TIMOTHY A. HUGHES**                                                                           **APPELLANT**

**v.**

**MARIEL HUGHES**                                                                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/12/2014 |
| TRIAL JUDGE: | HON. JAYE A. BRADLEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JAMIE E. COOK |
| | EARL L. DENHAM |
| ATTORNEY FOR APPELLEE: | DONALD P. SIGALAS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | MOTION TO TERMINATE ALIMONY DENIED |
| DISPOSITION: | AFFIRMED - 02/16/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., CARLTON, FAIR AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     The chancery court denied Tim Hughes's petition to terminate alimony because the court found that Tim had not proven that his ex-wife, Mariel Hughes, was cohabiting or in a de facto marriage with Darrell Hill.  Tim argues that the chancellor applied incorrect legal standards and that her ruling is "inconsistent with the weight of the evidence."  Finding no error, we affirm.

## PROCEDURAL HISTORY

¶2.     Tim and Mariel married in 1983.  In 2008, the Jackson County Chancery Court

granted Mariel a divorce on the ground of adultery. The court ordered Tim to pay periodic alimony of $2,500 per month. In 2011, Tim moved to modify the divorce judgment, alleging that Mariel's alimony should be terminated because she was cohabiting and in a de facto marriage with Darrell.

¶3. Tim's request to terminate alimony was set for a two-day trial on May 2, 2013, before Chancellor Charles Bordis. However, Tim was unable to complete his case-in-chief by the end of the second day, so the case was continued to September 5, 2013, and by subsequent order, to March 5, 2014. On March 3, 2014, Chancellor Bordis entered an order of recusal due to a newly developed conflict, and the case was reassigned to Chancellor Jaye Bradley. On March 5, 2014, trial resumed after Chancellor Bradley assured the parties that she had listened to the audio tapes of the previous trial days, was familiar with the issues, and was prepared to continue with the trial. The parties offered additional testimony and evidence over the course of two days and then rested. On March 12, 2014, the chancellor entered an order and judgment finding that Tim had failed to prove cohabitation or a de facto marriage. Accordingly, she denied Tim's request to terminate alimony. Subsequently, she denied Tim's motion to reconsider, alter, or amend the judgment.

¶4. Tim appealed and argues that the chancellor erred by finding that no material change in circumstances had occurred. Tim claims that the chancellor erred in two ways. First, he argues that the chancellor misapplied the legal standards for terminating alimony by conflating the issues of cohabitation and de facto marriage. Second, he argues that the chancellor's findings were "inconsistent" with the evidence presented at trial.

**ANALYSIS**

¶5.    "This Court will not 'disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous, or [applied] an erroneous legal standard . . . .'" *Burrus v. Burrus*, 962 So. 2d 618, 621 (¶15) (Miss. Ct. App. 2006) (quoting *Crow v. Crow*, 622 So. 2d 1226, 1228 (Miss. 1993)).

¶6.    A party seeking modification of an obligation to pay periodic alimony bears the burden of proof that "there has been a material or substantial change in circumstances since the divorce." *Hammonds v. Hammonds*, 641 So. 2d 1211, 1215-16 (Miss. 1994). The alimony recipient's "cohabitation" with or "de facto marriage" to another may be a change in circumstances justifying the termination of alimony. *Burrus*, 962 So. 2d at 621 (¶17). "The chancellor's findings of fact about cohabitation, de facto marriage, and mutual support are entitled to substantial deference when reviewed on appeal." *McMinn v. McMinn*, 171 So. 3d 511, 518 (¶27) (Miss. Ct. App. 2014) (quoting *Coggins v. Coggins*, 132 So. 3d 636, 643 (¶29) (Miss. Ct. App. 2014)).

**I.    Cohabitation**

¶7.    In an earlier time, a divorced woman risked forfeiture of her right to alimony payments if she engaged in a sexual relationship with another man subsequent to the divorce. *See, e.g.*, *Owen v. Gerity*, 422 So. 2d 284, 287-88 (Miss. 1982); *McHann v. McHann*, 383 So. 2d 823, 826 (Miss. 1980). Such forfeitures were based at least in part on "a moral judgment that a divorced woman should not engage in sexual relations." *Hammonds,* 641 So. 2d at 1216; *see also McHann*, 383 So. 2d at 826 ("To hold otherwise would be to

3

condone adultery . . . ."). However, in *Hammonds*, the Supreme Court limited this forfeiture doctrine to cases in which the alimony recipient is "cohabitating" with another and receiving support from, or providing support to, that person such that the *financial* need for alimony is reduced or eliminated. *Hammonds*, 641 So. 2d at 1217. Per *Hammonds*, the "moral aspects of the cohabitation" are no longer a basis for terminating alimony. *Id.* In a subsequent decision, the Court clarified that "proof of cohabitation creates a presumption that a material change in circumstances has occurred" and "shift[s] the burden to the recipient spouse to come forward with evidence suggesting that there is no mutual support." *Scharwath v. Scharwath*, 702 So. 2d 1210, 1211 (¶7) (Miss. 1997).

¶8.     In *Scharwath*, after Frank and Dianna divorced, Dianna commenced a relationship and cohabited with Jim Burns. *Id*. at (¶5). She allowed Burns to live in her home rent-free and provided him with a truck for use in his carpentry business. *Id*. at (¶6). In turn, Burns made improvements to the home, including re-flooring the basement and building a deck; he regularly mowed the yard; and he took on various other tasks and responsibilities around the house. *Id.* "He even moved furniture into the home[.]" *Id.* On these facts, the chancellor found that Dianna and Burns were cohabiting but denied Frank's petition to modify alimony because he found that the cohabitation did not involve substantial mutual support. *Id.* at (¶5). On appeal, the Supreme Court held that the chancellor erred by relying on "the lack of direct financial evidence" of mutual support. *Id.* at (¶7). The Court observed that "parties who live in cohabitation can easily and purposely keep their condition of mutual financial support concealed" if "only financial documentation" will suffice to support such a finding. *Id.* For

4

this reason, the Court adopted—and remanded to the chancellor with instructions to apply—a "rule that proof of cohabitation creates a presumption that a material change in circumstances has occurred." *Id.*

¶9. In a more recent case, Bill alleged that his ex-wife, Alicia, had forfeited her right to alimony by cohabiting with her boyfriend and enjoying his support. *Coggins*, 132 So. 3d at 643 (¶26). "Bill's main evidence of cohabitation" was that the boyfriend's car was often at Alicia's house late at night and early in the morning. *Id.* at (¶28). Alicia and her boyfriend admitted that he stayed at her house one or two nights a week, but both denied that he lived there permanently. *Id.* The boyfriend had his own residence, kept no personal items at Alicia's house, and did not contribute to her household financially or in kind. *Id.* The chancellor found that "Bill failed to prove Alicia cohabited with her boyfriend, so the mutual-support presumption did not arise." *Id.* at (¶27). The chancellor also found that even if Alicia and her boyfriend were deemed to be cohabiting, she had rebutted the presumption of mutual support. *Id.* Emphasizing that a "chancellor's findings of fact about cohabitation, de facto marriage, and mutual support 'are entitled to substantial deference when reviewed on appeal,'" we affirmed. *Id.* at (¶29) (quoting *Pritchard v. Pritchard*, 99 So. 3d 1174, 1177 (¶19) (Miss. Ct. App. 2012)).

¶10. In another recent case, we affirmed the denial of a motion to modify alimony on the following facts:

> Sharon [(the ex-wife)] had a sexual relationship with Rooks, regularly stayed overnight weekends and several days during the week, and went on vacations with him and his family. Sharon and Rooks testified that Sharon did not receive any financial help from him to pay her bills or contribute to her

5

> everyday expenses. Sharon also maintained a separate residence and stated that she and Rooks had no plans to marry. Keith [(the ex-husband)] testified that he observed Sharon's car at Rooks's house several times a week.

*McMinn*, 171 So. 3d at 518 (¶26). We agreed with the chancellor that a "relationship accompanied by sexual activity, alone, does not rise to the level necessary to forfeit alimony." *Id.* Indeed, the Supreme Court made this point clear twenty years earlier in *Hammonds*. We reemphasized that the chancellor's findings on these issues are entitled to "substantial deference when reviewed on appeal," and we found nothing "manifestly wrong" in the chancellor's determination that Keith failed to prove cohabitation or mutual support. *Id.* at (¶27) (quoting *Coggins*, 132 So. 3d at 643 (¶29)).

¶11. In this case, the chancellor found that Mariel and Darrell had been in a monogamous romantic relationship for approximately four years. They maintain separate residences—hers in Vancleave and his in Ocean Springs. Mariel testified that she could not say to any degree of certainty how many times they had spent the night together at one another's houses because she does not "count" or "keep track"; however, she believed that it was "probably" less than 100 times over the course of their four-year relationship. Darrell also could not provide a precise estimate, but he testified that at times he had stayed at her house "once a week or something" and that she had stayed at his home "occasionally." Tim hired a private investigator to take surveillance video of Mariel's and Darrell's homes. The investigator stated in his report and testified that, based on twelve "drive-by investigations," he believed that he had documented seven nights that the two spent together at one or the other's home during a two-month period in the fall of 2010.

6

¶12. Darrell and Mariel also acknowledged that they enjoy traveling together. Darrell has a barbecue business known as "Hog Wild & Pig Crazy" and a team that travels to barbecue competitions. Mariel does not have any ownership interest in the business, but she is a member of the competition team. Mariel and Darrell also share an interest in Corvettes and like to travel to Corvette shows. They have also attended family events together as a couple. When they take overnight trips together, they typically stay together at hotels or in the barbecue trailer, although they stay in different rooms when they visit Darrell's daughter.

¶13. Tim's other proof of the alleged cohabitation and mutual support included that Darrell had given Mariel gifts, including a diamond ring and other jewelry worth about $3,000; that Darrell stored a Corvette in Mariel's garage and often left another car at her house as well; that Darrell and Mariel shared a cell phone plan (a "family plan"); and that Darrell displayed one of his Corvettes at the National Corvette Museum in Bowling Green, Kentucky,[1] with signs stating that the car was "on loan from Darrell Hill & Mariel Hughes." Darrell testified that he asked someone at the museum to put Mariel's name on the signs because it was a "once-in-a-lifetime deal" and he thought she would like it. He explained that he stores a Corvette at her house because his insurance requires that it be kept in a locked garage, and he has no room in his own. He pays his part of the phone bill directly to C Spire.

¶14. Mariel and Darrell testified that although they enjoy each other's company, they have not discussed marriage and have no plans to get married. Mariel testified that she had been through two bad marriages and divorces and is not interested in marrying again. They also

---

[1] National Corvette Museum, http://www.corvettemuseum.org/ (last visited Dec. 28, 2015).

testified that Darrell does not keep clothes or other personal effects or receive mail at Mariel's house. The Hughes's daughter—who lives ten minutes from Mariel and visits two or three times a week—confirmed that she saw no evidence that Darrell lived at her mother's house, although she knew that he spent the night there on occasion. She testified, "Darrell doesn't live at her house."

¶15. Tim presented evidence that Darrell and Mariel often take turns paying expenses on trips (e.g., gasoline and hotel rooms) and for meals at restaurants. They also write checks to one another when one incurs an expense on the other's behalf, such as Christmas presents for their relatives or NASCAR tickets. However, there was no evidence that they share bank accounts, own any assets together, or pay each other's ordinary ongoing expenses, such as taxes or insurance. Mariel testified that Darrell had helped her mow her yard maybe six times during the course of their relationship, and she had mowed his yard once or twice.

¶16. On appeal, Tim argues that the chancellor erred by finding that Mariel and Darrell are not cohabiting. Tim argues that "it would certainly be reasonable to find cohabitation where the regularity of the couple's sleepover has been documented by a third party," i.e., the private investigator whom he hired. The threshold problem with this argument is that it fails to take into account the applicable standard of review. The question is not whether it would have been "reasonable" for the chancellor to have reached some other conclusion. Rather, the relevant question is whether the chancellor's findings are "manifestly wrong" or "clearly erroneous." *Burrus*, 962 So. 2d at 621 (¶15) (quoting *Crow*, 622 So. 2d at 1228). As stated above, "[t]he chancellor's findings of fact about cohabitation, de facto marriage, and mutual

8

support are entitled to substantial deference when reviewed on appeal." *McMinn*, 171 So. 3d at 518 (¶27) (quoting *Coggins*, 132 So. 3d at 643 (¶29)).

¶17.    Moreover, the investigator's testimony that he watched Mariel's and/or Darrell's homes on approximately twelve days over the course of two months in the fall of 2010 and believed that they spent the night together seven times is hardly conclusive proof of "cohabitation."  Indeed, even accepting Tim's view of this evidence, it is not materially distinguishable from the evidence deemed insufficient to establish cohabitation in *Coggins* and *McMinn*.  In *Coggins*, the boyfriend stayed at the ex-wife's house once or twice a week but did not keep personal effects there, did not contribute to the household financially, and maintained his own residence.  *Coggins*, 132 So. 3d at 643 (¶¶26-29).  In *McMinn*, the ex-wife "regularly stayed overnight [with her boyfriend on] weekends and several days during the week, and went on vacations with him and his family"; however, the two maintained separate residences and finances.  *McMinn*, 171 So. 3d at 518 (¶26).  This case is no different.  Given that Darrell and Mariel consistently have maintained separate residences and finances, the facts that they went on trips together and spent the night at each other's houses—even if on a somewhat regular basis—do not establish "cohabitation" as a matter of law.  Applying our deferential standard of review, the chancellor's findings on this issue are not manifestly wrong or clearly erroneous.  Accordingly, the chancellor properly declined to apply the presumption of mutual support.[2]

---

[2] Although the chancellor correctly ruled that the presumption of mutual support did not apply, she also discussed the lack of evidence of mutual support.  She found "that the only benefit (other than companionship) received by either [Darrell] or Mariel" was the sharing of travel expenses, which makes their trips "less expensive" and thus "allows them

9

## II. De Facto Marriage

¶18. In the absence of cohabitation, alimony can be terminated based on proof of what has been termed a "de facto marriage." A de facto marriage may be proven in two ways. *See* Deborah H. Bell*, Mississippi Family Law* § 9.10[2] (2005). First, a chancellor may find a de facto marriage if the alimony recipient is deliberately avoiding remarriage merely to continue receiving alimony. *See Martin v. Martin*, 751 So. 2d 1132, 1136 (¶16) (Miss. Ct. App. 1999). Second, a de facto marriage can be found absent cohabitation if the alimony recipient and another person have "so fashioned their relationship, to include their physical living arrangements and financial affairs, that they could reasonably be considered as having entered into a de facto marriage." *Pope v. Pope*, 803 So. 2d 499, 504 (¶12) (Miss. Ct. App. 2002) (citing *Scharwath*, 702 So. 2d at 1211 (¶¶6-7)). We discuss these two theories of de facto marriage below.

### A. Avoiding Remarriage

¶19. In *Martin*, Ben and Linda's divorce judgment required Ben to pay Linda periodic alimony of $5,000 per month. *Martin*, 751 So. 2d at 1133 (¶3). After the divorce, Linda became involved in a long-term relationship with Norm Anderson. *Id.* at (¶5). Linda wore a diamond engagement ring that Anderson gave her, and the couple told friends that they planned to marry "next year," but then testified that they had no immediate plans to marry. *Id.* However, on cross-examination, Linda "admitted . . . that she and Anderson had not

---

to go on excursions they [might] not otherwise be able to enjoy." The chancellor did not clearly or manifestly err by concluding that the mere sharing of travel expenses with a boyfriend is not "mutual support" sufficient to warrant the termination of alimony.

married because she need[ed] the financial support provided by the alimony received from [Ben]." *Id.* Linda and Anderson maintained separate homes, though Anderson did have a key to Linda's home. *Id.* at 1133-34 (¶6). Anderson spent the night at Linda's home only a few times a month, but he ate meals there regularly, ran errands for her, and did yard work and other household chores. *Id.* at 1134 (¶6). Linda and Anderson vacationed together and admitted to a sexual relationship. *Id.* They spent holidays together and bought gifts for each other, and Linda had written Anderson checks totaling over $11,000 over a three-year period. *Id.* Anderson also provided Linda with substantial discounts on clothing and cosmetics from the department store where he worked. *Id.* Based on this evidence, the chancellor found that Linda and Anderson had entered into a "de facto marriage" and terminated Ben's alimony obligations. *Id.* at 1134-35 (¶¶10, 14).

¶20. On appeal, we concluded that there was "substantial evidence in the record to support the chancellor's finding that [Linda] and Anderson [had] provided 'mutual support' to one another." *Id.* at 1136 (¶15). Anderson provided discounts and domestic services to Linda, and Linda wrote him checks and allowed him use of her "luxurious home." *Id.* Thus, we found that it was "clear from the record that Anderson benefit[ted] from [Ben's] largesse and [Linda] benefit[ted] financially from her relationship with Anderson." *Id.*

¶21. We also affirmed the chancellor's termination of alimony on the ground that Linda had "structured her relationship with Anderson in an attempt to circumvent the appearance of cohabitation so as to continue her alimony." *Id.* at (¶16). We did so based on Linda's admission under oath "that she and Anderson had not married because she need[ed] the

11

financial support provided by [her] alimony." *Id.* We held that when "an alimony recipient spouse purposefully avoids marriage merely to continue receiving alimony, equity should not require the paying spouse to endure supporting such misconduct." *Id.* (quoting *Anderson v. Anderson*, 692 So. 2d 65, 72 (Miss. 1997)).[3]

¶22. Tim tries to fit this case within the holding in *Martin*, citing an alleged conversation between his sister-in-law (Tammy Hughes) and Mariel in which Mariel supposedly said that marrying Darrell would "mess things up" in some unspecified way. However, Mariel testified that she was uninterested in remarriage not because of financial considerations but rather because of her bad experiences with two prior marriages and divorces, including Tim's adultery during their marriage. Given Mariel's own testimony, Tammy's recollection of an ambiguous comment is hardly the equivalent of Linda Martin's admission under oath that she was avoiding marriage solely to continue her alimony payments. Given the conflicting evidence and arguments presented by the parties in this case, as well as the lack of any significant evidence of mutual support, we cannot say that the chancellor manifestly or clearly erred by finding that the relationship between Darrell and Mariel was not a "de facto marriage" structured solely to continue alimony payments.

### B. Living Arrangements and Financial Affairs

¶23. As noted previously, a de facto marriage may exist where an alimony recipient and a third party have "so fashioned their relationship, to include their physical living

---

[3] We also note that in terminating alimony, the chancellor in *Martin* considered Linda's "sizable net worth" (over $900,000), receipt of alimony for seven years totaling $420,000, and "substantial earning potential" as an attorney. *Martin*, 751 So. 2d at 1134, 1136-37 (¶¶10, 18). This case does not involve any similar considerations.

12

arrangements and financial affairs, that they could reasonably be considered as having entered into a de facto marriage." *Pope*, 803 So. 2d at 504 (¶12) (citing *Scharwath*, 702 So. 2d at 1211 (¶¶6-7)). In *Pope*, the chancellor found that no material change in circumstances had occurred where the ex-wife became "romantically involved with another man," she "spent a number of weekends in his company" at his expense, and "on five or six occasions [he] stayed overnight in her home." *Id*. at (¶11). There was also evidence that he "helped her buy groceries" when he visited and loaned her $4,000, which she later repaid. *Id.* We affirmed, concluding that the chancellor did not abuse his discretion by finding "that the relationship . . . had never risen to the level . . . [of] a de facto marriage relationship." *Id.* at (¶13).

¶24. Conversely, in *Burrus*, we affirmed a chancellor's finding of a de facto marriage between the alimony recipient, Jolee, and James, who regularly stayed at her house. "James had a key to Jolee's home and kept his clothes there." *Burrus*, 962 So. 2d at 622 (¶18). Jolee also gave James an ATM card for her bank account and authority to use it. She spent more than $7,500 on, among other things, James's attorneys' fees and other costs of his defense on criminal charges, his motel rooms while he was attempting to evade arrest, and his clothes, cell phone, and cell phone bills. *Id.* "In return, James . . . continually performed and provided 'in kind' household services and chores in Jolee's home, including maintenance and repair of the home." *Id.* "Additionally, Jolee testified, as did her children, that she had recently gotten a tattoo that [said], 'James' girl.'" *Id.*[4]

---

[4] *See also Pritchard*, 99 So. 3d at 1177-79 (¶¶20-29) (holding that a de facto marriage existed where the alimony recipient lived with a man for four years, moved with him three

13

¶25. Tim contends that the chancellor improperly conflated the distinct issues of de facto marriage and cohabitation. The chancellor did state that "there was inadequate proof of cohabitation so the presumption of a de facto marriage never materialized," but she also stated that the "Supreme Court has held that periodic alimony may be terminated based on the cohabitation of the recipient spouse with another person *or a de facto marriage*" (emphasis ours). It is clear that the chancellor recognized the two methods by which alimony could be terminated.

¶26. Tim also argues that the chancellor misapplied the legal standard for finding a de facto marriage because "Mariel and Darrell have quite obviously structured their relationship such that they engage in the same lifestyle of a married couple." Again, we disagree. Mariel and Darrell admitted that they spend the night together at each other's homes and have taken a number of trips and vacations together. However, they maintain separate residences, and Darrell does not keep clothes or other personal belongings at Mariel's house. Further, neither had access to the other's financial accounts, and they share only a cell phone account that each pays separately. There was also evidence that Mariel and Darrell roughly pay their own share of expenses when they go on trips or vacations, and neither pays for the other's groceries or other regular ongoing expenses. Like most couples in a dating relationship, they have given each other gifts, but they testified that the gifts were not given in contemplation of marriage. These facts are more analogous to *Pope* than *Burrus*, but "[t]he most important distinction" in these cases "is the finding of the chancellor." *Burrus*, 962 So. 2d at 624 (¶24).

times, including across state lines, and used her alimony payments to pay his bills).

14

We will not reverse a chancellor's findings regarding the existence or nonexistence of a de facto marriage unless they are manifestly or clearly erroneous. *See id.* at 621 (¶15). In this case, Tim failed to prove that Mariel and Darrell have "so fashioned their relationship, to include their physical living arrangements and financial affairs, that they could reasonably be considered as having entered into a de facto marriage." *Pope*, 803 So. 2d at 504 (¶12). Thus, the chancellor did not clearly err by finding that the relationship between Darrell and Mariel did not rise to the level of a de facto marriage.

## CONCLUSION

¶27. After a thorough review of the record, we find no manifest error, abuse of discretion, or misapplication of the law. We therefore affirm the judgment of the Jackson County Chancery Court.

¶28. **THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR AND JAMES, JJ., CONCUR. IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., NOT PARTICIPATING.**