# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01542-COA

JOHN T. MCADAMS

APPELLANT/
CROSS-APPELLEE

v.

JULIE F. MCADAMS

APPELLEE/
CROSS-APPELLANT

| | |
|---|---|
| DATE OF JUDGMENT: | 09/26/2017 |
| TRIAL JUDGE: | HON. J. LARRY BUFFINGTON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | PAUL SNOW |
| ATTORNEY FOR APPELLEE: | S. CHRISTOPHER FARRIS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED - 12/04/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., FAIR AND WILSON, JJ.**

**FAIR, J., FOR THE COURT:**

¶1.     In this appeal, John McAdams claims the Harrison County Chancery Court erred when it did not terminate his periodic alimony obligation based on Julie McAdams's relationship with A.J. Raymond. Alternatively, John argues that his alimony obligation should be reduced because Julie's financial position has improved and his has not. Finally, John claims the chancellor should not have awarded Julie $1,000 in attorney's fees. Julie cross-appeals and claims the chancellor should have awarded her more attorney's fees. Finding no error, we affirm the chancery court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2. John and Julie were married for approximately thirty years. They divorced in June 2005 due to irreconcilable differences. This appeal centers on John's resulting obligation to pay Julie $2,000 per month in periodic alimony.

¶3. In February 2017, John petitioned to terminate his alimony obligation and alleged that Julie was cohabiting and in a de facto marriage with Raymond. Failing that, John claimed that his alimony obligation should be reduced due to Julie's improved financial position. John also wanted Julie to reimburse him for $192,000 in alimony that he paid after she began working.

¶4. Julie contested John's petition and filed a counterclaim for increased alimony. She also argued that John was in contempt because he stopped paying alimony when he filed his petition. Finally, Julie asked for any attorney's fees that she would incur while contesting John's petition and proving her contempt allegation.

¶5. At trial, the chancellor heard testimony from Julie, John, and Raymond. Through a stipulation, John presented evidence gathered by two private investigators who periodically drove by Julie's condo in Gulfport, Mississippi, and Raymond's house in Maurepas, Louisiana, between January 17 and March 6, 2017. The evidence presented at trial will be discussed in greater detail below.

¶6. The chancellor denied John's petition to terminate alimony without commenting on his cohabitation and de facto marriage claims. The chancellor also denied Julie's request for increased alimony. Although the chancellor initially reduced John's monthly alimony

2

obligation by $150 because Julie had begun receiving social security benefits derived from her own earnings, the chancellor subsequently changed his mind incident to Julie's post-trial motion. After finding that John had "wrongfully" deposited two alimony payments in the chancery court's registry instead of paying them to Julie, the chancellor awarded Julie $1,000 of the $7,500 in attorney's fees that she requested. John appeals, and Julie cross-appeals.

**DISCUSSION**

### I. Termination of Alimony

¶7. John claims the chancellor should have terminated his alimony obligation because Julie and Raymond were cohabiting or involved in a de facto marriage. As mentioned above, the chancellor denied John's petition without otherwise commenting on his cohabitation and de facto marriage allegations. Even so, "[w]ith respect to issues of fact where the chancellor made no specific finding," we assume that he "resolved all such fact issues in favor of the appellee, or at least in a manner that is consistent with the decree." *Smith v. Smith*, 545 So. 2d 725, 727 (Miss. 1989).

¶8. John bore the burden of proving that "there has been a material or substantial change in circumstances since the divorce." *Hughes v. Hughes*, 186 So. 3d 394, 397 (¶6) (Miss. Ct. App. 2016). Alimony may be modified when there is "mutual support between the recipient . . . and another individual which alters the recipient['s] . . . financial needs." *Scharwath v. Scharwath*, 702 So. 2d 1210, 1211 (¶6) (Miss. 1997). "The alimony recipient's cohabitation with or de facto marriage to another may be a change in circumstances justifying the termination of alimony." *Hughes*, 186 So. 3d at 397 (¶6) (internal quotation marks omitted).

3

"The chancellor's findings of fact about cohabitation, de facto marriage, and mutual support are entitled to substantial deference when reviewed on appeal." *Id*.

### A. Cohabitation

¶9.     John claims that the chancellor should have found that Julie and Raymond had been cohabiting. "[C]ohabitation creates a presumption that a material change in circumstances has occurred. . . . This presumption will shift the burden to the recipient . . . to come forward with evidence suggesting that there is no mutual support . . . ." *Scharwath*, 702 So. 2d at 1211 (¶7) (citation omitted). According to John, he should not have to pay Julie alimony because she failed to rebut the mutual-support presumption.

¶10.    Julie and Raymond met and began dating after Julie and John's 2005 divorce.[1] According to Julie, she and Raymond broke up after dating for three or four years. They resumed their relationship in late 2015. From then until the time of trial, their relationship had been intimate and exclusive, but they always had separate residences. Julie had been living in her Gulfport condo since 2005.[2] Raymond's home was in Maurepas, Louisiana. Julie and Raymond both testified that they do not spend every night together.

¶11.    Through a stipulation, John presented evidence gathered by two private investigators who periodically drove by Julie's condo or Raymond's home on a near-daily basis between January 17 and March 6, 2015. The private investigators generally checked between 1:00

---

[1] In his opening brief, John mischaracterizes Julie and Raymond's relationship as though it has been continuous since 2005, but Julie and Raymond both testified otherwise.

[2] Julie's mother originally bought the condo in 2005, and Julie subsequently bought it from her mother.

p.m. and 5:00 p.m., and they usually found Julie's and Raymond's vehicles in the same place.

Julie testified that it takes approximately an hour and a half to drive between her home and Raymond's, but they do not typically drive back and forth in a single day. So, combined with Julie's testimony, the private investigators' reports suggested that Julie and Raymond had spent the night together approximately thirty-six of the forty-nine days that they checked. Thus, the chancellor could have reasonably concluded that Julie and Raymond spent the night together during the times that their vehicles were in the same place. But that is not outcome determinative in this case. *Hughes*, 186 So. 3d at 400 (¶16) ("The question is not whether it would have been 'reasonable' for the chancellor to have reached some other conclusion. Rather, the relevant question is whether the chancellor's findings are 'manifestly wrong' or 'clearly erroneous.'").

¶12.    As discussed in *Hughes*:

> The investigator's testimony that he watched Mariel's and/or Darrell's homes on approximately twelve days over the course of two months in the fall of 2010 and believed that they spent the night together seven times is hardly conclusive proof of "cohabitation." Indeed, even accepting Tim's view of this evidence, it is not materially distinguishable from the evidence deemed insufficient to establish cohabitation in *Coggins* [*v. Coggins*, 132 So. 3d 636 (Miss. Ct. App. 2014)] and *McMinn* [*v. McMinn*, 171 So. 3d 511 (Miss. Ct. App. 2014)]. In *Coggins*, the boyfriend stayed at the ex-wife's house once or twice a week but did not keep personal effects there, did not contribute to the household financially, and maintained his own residence. *Coggins*, 132 So. 3d at 643 (¶¶26-29). In *McMinn*, the ex-wife "regularly stayed overnight with her boyfriend on weekends and several days during the week, and went on vacations with him and his family"; however, the two maintained separate residences and finances. *McMinn*, 171 So. 3d at 518 (¶26). This case is no different. Given that Darrell and Mariel consistently have maintained separate residences and finances, the facts that they went on trips together and spent the night at each other's houses—even if on a somewhat regular basis—do not establish "cohabitation" as a matter of law. Applying our deferential standard

5

of review, the chancellor's findings on this issue are not manifestly wrong or clearly erroneous. Accordingly, the chancellor properly declined to apply the presumption of mutual support.

*Hughes*, 186 So. 3d at 400 (¶17) (brackets omitted).

¶13. Whether evidence rises to the level of proof of cohabitation is extremely fact driven, and our deferential standard of review often means that two chancellors could view the same evidence and reach different results that would both be upheld on appeal. Here, it was not unreasonable for the chancellor to find that the evidence fell short of establishing cohabitation. Notwithstanding the private investigators' reports, Julie and Raymond both have their own homes, and they testified that they do not share finances. Because the chancellor's findings on this issue were not manifestly wrong or clearly erroneous, it was unnecessary for Julie to rebut the mutual-support presumption. It follows that the chancellor did not err when he denied John's petition to terminate his alimony obligation due to Julie's alleged cohabitation with Raymond.

### B. De Facto Marriage

¶14. John claims that the chancellor should have terminated his alimony obligation because Julie and Raymond were in a de facto marriage. "A de facto marriage may be prove[d] in two ways." *Id*. at (¶18). "First, a chancellor may find a de facto marriage if the alimony recipient is deliberately avoiding remarriage merely to continue receiving alimony." *Id*. Here, there was no evidence to support such a conclusion. But a chancellor can also find that a couple is involved in a de facto marriage "if the alimony recipient and another person have so fashioned their relationship, to include their physical living arrangements and financial

6

affairs, that they could reasonably be considered as having entered into a de facto marriage." *Id*. (internal quotation mark omitted).

¶15. In *Martin v. Martin*, 751 So. 2d 1132, 1133 (¶3) (Miss. Ct. App. 1999), an ex-husband was required to pay periodic alimony. The ex-wife subsequently became involved in a long-term relationship. *Id*. at (¶5). She wore a diamond engagement ring that her boyfriend gave her, and the couple consistently told their friends that they planned to marry "next year." *Id*. During cross-examination, the ex-wife admitted that she and her boyfriend had not married because she wanted to continue receiving alimony. *Id*. The ex-wife and her boyfriend had separate places to live, but the boyfriend's home was an "efficiency apartment," while the ex-wife's home was "luxurious." *Id*. at 1133, 1136 (¶¶6, 15). The boyfriend had a key to the ex-wife's home, spent the night there a few times each month, regularly ate meals there, and ran errands and did chores for her. *Id*. at 1133 (¶6). Plus, the ex-wife had given her boyfriend more than $11,000 over a three-year period. *Id*. The ex-wife also receive substantial discounts on clothes and cosmetics at the store where her boyfriend worked. *Id*. In that case, the chancellor terminated the ex-husband's alimony obligation because the ex-wife and her boyfriend had entered into a "de facto marriage." *Id*. at 1134-35 (¶¶10, 14). This Court upheld the chancellor's decision that the ex-wife had "structured her relationship with [her boyfriend] in an attempt to circumvent the appearance of cohabitation so as to continue her alimony." *Id*. at (¶16).

¶16. In *Hughes*, 186 So. 3d at 398-99 (¶¶11, 13), the ex-wife and her boyfriend had been dating exclusively for four years, and the ex-wife wore a diamond ring that her boyfriend had

given her. Although they had separate houses, they spent the night together at least once a week. *Id*. at 398 (¶11). They traveled and vacationed together, and the boyfriend exhibited one of his Corvettes at the National Corvette Museum with a plaque stating that the car was on loan from him and the ex-wife. *Id*. at 399 (¶13). They denied that they had discussed marriage, but there was testimony that the ex-wife once said that it would "'mess things up' in some unspecified way" if she married her boyfriend. *Id*. at 401 (¶22).

¶17. This Court affirmed the chancellor's judgment that the ex-husband had failed to prove the existence of a de facto marriage. *Id*. at 403 (¶26). There was no clear evidence that the ex-wife was avoiding remarriage solely to continue her alimony payments. *Id*. at 401 (¶22). And the evidence was conflicting at best as to whether she and her boyfriend had "so fashioned their relationship, to include their physical living arrangements and financial affairs, that they could reasonably be considered as having entered into a de facto marriage." *Id*. at 403 (¶26). They had separate homes, and they did not have access to each other's financial accounts. *Id*. at 402-03 (¶26). Most importantly, the chancellor's findings simply were not "manifestly or clearly erroneous." *Id*. at 403 (¶26).

¶18. Julie and Raymond both testified that they were not planning to marry. They also testified that they do not share finances or own any assets together. There was no evidence that Raymond gives Julie money or access to his financial accounts. There was testimony that Raymond and Julie take vacations together and they share a bed when they do. Raymond testified that they split the costs of their trips. They also attend various events and shop for groceries together. At one time, they each had keys to one another's homes, but as of the

trial, Julie was not sure whether she still had a key to Raymond's condo. Julie testified that she and Raymond do not keep clothes at one another's homes, so they pack a bag when they visit. Julie said that she sometimes washes her clothes at Raymond's house, and she occasionally does Raymond's laundry along with her own. Similarly, Raymond testified that "[e]very time something would break [at Julie's condo, he'd] fix it for her, so she didn't have to pay [any]body." Finally, there was evidence that Raymond had given Julie cards, candy, flowers, and what Julie described as "costume" jewelry.

¶19. "We will not reverse a chancellor's findings regarding the existence or nonexistence of a de facto marriage unless they are manifestly or clearly erroneous." *Id*. The facts of this case are closer to those in *Hughes* than they are to *Martin*. It was not manifestly or clearly erroneous for the chancellor to decide that Julie and Raymond were not involved in a de facto marriage. Thus, we find no merit to this issue.

## II. Reduction of Alimony

¶20. Next, John claims the chancellor should have reduced the amount of alimony that he has to pay Julie. John's reasoning is based on his assertions that Julie's financial circumstances have improved and his financial circumstances have diminished. The party seeking to modify alimony bears the burden of proving a material, substantial, and unanticipated change of circumstances. *See McCraw v. McCraw*, 759 So. 2d 519, 521 (¶7) (Miss. Ct. App. 2000).

¶21. John notes that Julie's net worth has increased since their divorce, and her expenses have decreased. He further notes that Julie has begun receiving social security benefits.

9

Conversely, he says that his own net worth has decreased since the divorce and his liabilities have increased. John's financial position was somewhat selective, though, as it relied on the premise that he would have to continue paying housing expenses for a house that he was selling. That is, John had remarried as of the time of trial, and he had moved into his new wife's home. He had entered a contract with a prospective purchaser for the sale of his home, so he would soon no longer have to pay approximately $2,000 per month for the mortgages on that home. His utility and other related expenses would also decrease. John also testified that his income had doubled since the divorce. And a significant portion of John's listed expenses related to his and Julie's adult daughter and her children.

¶22. It was within the chancellor's discretion to implicitly find that Julie's improved financial position nearly twelve years after her and John's divorce was not unanticipated. It was also within the chancellor's discretion to implicitly find that John's financial position was not as dire as his financial statement suggested. As for Julie's receipt of social security benefits, the Mississippi Supreme Court has recently held that "benefits derived from the other spouse's income *do not* constitute a special circumstance triggering an automatic reduction in alimony." *Harris v. Harris*, 241 So. 3d 622, 628 (¶19) (Miss. 2018). Julie's social security benefits derive from *her own* income. Her benefits do not justify an automatic reduction in John's alimony obligation. This issue is meritless.

### III. Attorney's Fees

¶23. John filed his petition to terminate alimony in February 2017. At the beginning of March and April 2017, he deposited Julie's alimony check in the court's registry. On April

10

26, 2017, Julie received the $4,000 in alimony that John owed her.[3]   For two months after

John filed his petition to terminate or reduce his alimony obligation, he deposited the checks

for alimony that he would otherwise pay Julie into the court's registry.

¶24.    During his bench ruling, the chancellor ordered John to pay Julie $1,000 in attorney's

fees.  According to the chancellor, the award was "contribution to [Julie] for the filing of the

petition for contempt."   The chancellor added: "I know we had a hearing and [John]

deposited [alimony payments] with the clerk's office, however, the Court finds that that was

wrongfully done and, therefore, I am going to order that amount to be paid."   The

chancellor's judgment memorialized his ruling by stating:  "When he filed his petition, John

. . . tendered his alimony payment into the registry of the Court for two months.  The Court

hereby orders John . . . to pay the sum of $1,000 to Julie . . . as attorney['s] fees within thirty

(30) days of the entry of this judgment."

¶25.    John argues that the chancellor should not have awarded Julie $1,000 in attorney's

fees because (a) only the March 2017 alimony payment was late; (b) the chancellor did not

find that he was willfully in contempt; (c) there was no clear and convincing evidence that

he was in contempt; and (d) there was no evidence regarding "the work involved concerning

attorney's fees dealing with the contempt issue."[4]

---

[3] The 2005 divorce judgment failed to provide a deadline for each month's alimony payment.  On October 19, 2017, the chancellor entered an order stating that John must "put in the mail the alimony check on the first day of each and every month from this day forward."

[4] At trial, John testified that his attorney had advised him to deposit Julie's alimony into the court's registry.  He does not claim on appeal that his attorney's advice absolves him of the award of attorney's fees.

¶26. True enough, the chancellor did not expressly find that John was in contempt for withholding two alimony payments, and only one of the payments was late. But the chancellor said that John's withholding of Julie's alimony was "wrongfully done" and the award of attorney's fees was "contribution to [Julie] for the filing of the petition for contempt." Consequently, we interpret the chancellor's determination as though he found that John was in contempt for failing to timely pay Julie alimony during March 2017.

¶27. As for whether it was reasonable for the chancellor to find John in contempt:

> In general, a chancellor has substantial discretion in deciding whether a party is in contempt. The chancellor, who sits in the unique position to observe the parties and their demeanor, the evidence, and the testimony, is infinitely more competent to decide contempt matters than we are. Because contempt is an issue of fact to be decided on a case-by-case basis, these matters are committed to the substantial discretion of the trial court. Therefore, [an appellate court] will not reverse a chancellor's finding where it is supported by substantial credible evidence.

*Gutierrez v. Gutierrez*, 233 So. 3d 797, 815 (¶46) (Miss. 2017) (brackets, citations, and internal quotation marks omitted). "To be found in contempt, a party has to willfully and deliberately violate a court order." *McKnight v. Jenkins*, 155 So. 3d 730, 732 (¶7) (Miss. 2013).

¶28. Without question, John did not timely pay Julie's March 2017 alimony. A prima facie case of contempt is established upon production of evidence of one's failure to comply with a previous court order. *McCardle v. McCardle*, 862 So. 2d 1290, 1293 (¶11) (Miss. Ct. App. 2004). John notes that in *Pritchard v. Pritchard*, 99 So. 3d 1174, 1179 (¶29) (Miss. Ct. App. 2012), this Court held that an ex-husband should not have been held in contempt for nonpayment of alimony because the trial court should have found that his ex-wife was in a

de facto marriage. There is an obvious distinction between *Pritchard* and this case. As discussed above, it was within the chancellor's discretion to find that John failed to prove that Julie was cohabiting with Raymond or that they were involved in a de facto marriage. By extension, John's alimony obligation did not end, and he was reasonably held in contempt for withholding Julie's March 2017 alimony.

¶29. "When a party is held in contempt for violating a valid judgment of the court, attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment." *Heisinger v. Riley*, 243 So. 3d 248, 259 (¶45) (Miss. Ct. App. 2018). "Fees awarded on this basis, though, should not exceed the expense incurred as a result of the contemptuous conduct." *Id*. "[F]ees incurred litigating other matters . . . are not recoverable based on the contempt." *Id*. In other words, the $1,000 in attorney's fees could not be related to Julie's defense against John's petition to terminate alimony. It is true that there was no specific evidence regarding the attorney's fees that Julie incurred related to John's contempt, but we upheld a similar award in *Heisinger*. *Id*. (citing Miss. Code Ann. § 9-1-41 (Rev. 2014) ("In any action in which a court is authorized to award reasonable attorneys' fees, the court [may] make the award based on the information already before it and the court's own opinion based on experience and observation . . . .")). We decline to disturb the chancellor's award of $1,000 in attorney's fees.

**CROSS-APPEAL**

¶30. Julie argues that the chancellor should have awarded her $7,500 in attorney's fees because that was the flat fee that her attorney charged. She says that she should not be

required to exhaust her resources to defend against John's petition to terminate alimony. But the law does not require John to pay for the attorney's fees that Julie incurred while defending against his petition to terminate alimony simply because he did not prevail on his claim. And the chancellor did not find that John's claim was frivolous. As such, she would only be able to recover those fees if she is unable to pay them. *Rhodes v. Rhodes*, 52 So. 3d 430, 449 (¶79) (Miss. Ct. App. 2011). It is not enough that John "is more capable of paying her attorney's fees." *Id*. Julie receives $2,000 per month in alimony, and she receives more than $1,000 per month in social security benefits. The chancellor did not abuse his discretion when he declined to award Julie the rest of the attorney's fees that she incurred.

¶31.    Julie also requests attorney's fees related to this appeal. Her record excerpts include an itemized statement indicating that her attorney charged her $2,865 for the appeal. More specifically, her attorney charged her $300 per hour for 8.75 hours of work, and he billed her an additional $240 in expenses related to filing the cross-appeal and two motions for briefing time. But the vast majority of Julie's responsive brief is dedicated to the chancellor's denial of John's petition to terminate alimony. At the same time, she also had to defend against John's claim that the chancellor erred by awarding her $1,000 in attorney's fees. Thus, we find that Julie should be awarded some attorney's fees. *See Riley v. Riley*, 196 So. 3d 1159, 1164-66 (¶¶23-32) (Miss. Ct. App. 2016) (holding that an award of appellate attorney's fees is appropriate when the chancellor awarded fees based on a finding of contempt and the recipient must defend the finding on appeal). Therefore, we award Julie $500 in appellate attorney's fees. *See id*. at 1164 (¶23) ("Generally, on appeal this Court awards attorney's

14

fees of one-half of what was awarded in the trial court.").

## CONCLUSION

¶32.   The chancellor did not err when he denied John's petition to terminate or modify his alimony obligation.  It was within the chancellor's discretion to award Julie $1,000 related to John's withholding of her March 2017 alimony but not all of the attorney's fees she requested.  Thus, we affirm the chancellor's judgment.  Finally, this Court awards Julie $500 in appellate attorney's fees.

¶33.   **ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.  TINDELL, J., NOT PARTICIPATING.**